[Crim. No. 4455. Fourth Dist., Div. One. Jan. 4, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ROGER ALBRIGHT GOODSPEED, Defendant and Appellant.

692

## COUNSEL

Douglas, Pendleton & Applbaum and Alan Douglas for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Derald E. Granberg, Deputy Attorney General, for Plaintiff and Respondent.

## OPINION

**COUGHLIN, J.**[*]—Defendant was charged, by indictment, with the offense of murder; was tried by a jury; was convicted of manslaughter, an included offense; and appeals. Two codefendants, Jimmy Monk and Gary Bowers, also were charged with murder; entered pleas of guilty to murder in the second degree under a plea bargain whereby they agreed

---

[*]Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

to and did testify in the trial of defendant, Monk being called as a witness by the prosecution and Bowers being called as a witness by defendant.

The victim of the homicide was Olga Acosta who was known as Billie Jo. The killing occurred in the latter part of September 1969.

Defendant's participation in the offense is established by evidence of incriminating statements made by him both before and after the killing, including a statement he made to a man named Marler in which he said he, Monk and Bowers killed Billie Jo because she was an informer, and beat her up to make "it look like a righteous sex crime"; by evidence establishing his association with Billie Jo and connecting him with her disappearance, including evidence showing on the day after her disappearance, he was wearing a medallion Billie Jo used as part of a belt; by other circumstantial evidence; and by testimony of Monk and Bowers.

Billie Jo's body was found November 4, 1969 in a vacant lot where she had been killed. An autopsy revealed her arm had been fractured; other bones had been fractured; and she died of strangulation.

Monk and Bowers testified, in substance, they killed Billie Jo; detailed their brutal mistreatment of her which included breaking her arm and dropping a 40-pound cement block on her chest and back; and related how she was strangled with a neckerchief. Their testimony supports the conclusion defendant did not physically participate in any of the acts of mistreatment or the actual killing of Billie Jo; left the scene of the killing before they concluded their mistreatment; but masterminded the killing because he suspected Billie Jo was a narcotics agent; and instructed, directed and ordered them to commit many of the acts of mistreatment inflicted upon her, including her strangulation.

Defendant testified; denied harming Billie Jo, ordering Monk and Bowers to harm her, or ever being at the place where her body was found. In addition, he asserted the defense of diminished capacity and produced evidence in support of this defense. The court instructed accordingly. The verdict of the jury finding defendant guilty of involuntary manslaughter indicates acceptance of this evidence and adherence to the instructions in question.

Before trial defendant moved to quash the indictment upon the ground the selection and impanelment of the grand jury did not comply with constitutional and statutory requirements in the premises, and use of the indictment process denied him constitutional rights.

■ On appeal defendant contends the court erred (1) in refusing to admit evidence proving Monk and Bowers, a few days after the homicide, assaulted and robbed a taxicab driver; (2) in instructing the jury testimony of incriminating statements by Monk and Bowers respecting the homicide were to be considered only for the purpose of testing their credibility as witnesses, and not as evidence of the truth of the facts stated; and (3) in denying his motion to quash the indictment.

Defendant made an offer to prove Bowers, accompanied by Monk, on October 2, 1969, assaulted a taxicab driver; Monk attempted to flee, was apprehended, but later released; Bowers was arrested and detained "on the charge"; and Bowers said the reason he assaulted the cab driver was because he saw an opportunity to get some money. At trial defendant stated the purpose of this offered evidence was to show Monk and Bowers would inflict great bodily injury upon people without instructions from anyone; and urged such a showing would, in some way, tend to prove defendant had not ordered, directed or instructed Monk and Bowers to kill Billie Jo. The court sustained an objection to the offer of proof. On appeal defendant asserts the purpose of the evidence he offered to prove was to show "Monk and Bowers predetermined to testify they only acted upon Goodspeed's direction," and to show they framed him. The latter purpose is related to testimony by Marler of an alleged conversation between him and Bowers, in the presence of Monk, in which Bowers said: "We already got someone framed you know who is going to take the rap for killing her," i.e., Billie Jo. Both Monk and Bowers denied the statement was made. Proof Bowers, in the presence of Monk, assaulted the cab driver with intent to rob him, is not proof either of them predetermined to testify they only acted on Goodspeed's direction or intended to frame defendant "to take the rap" for killing Billie Jo.

The order sustaining the objection to the offer of proof was premised on two applicable grounds, namely, (1) the evidence was not relevant and (2) the evidence would raise a substantial collateral issue which the court, under the circumstances, properly avoided. ■ Determinations respecting the materiality or relevancy of evidence involve the exercise of judicial discretion and the conclusions of the trial court in the premises, absent a showing of abuse of that discretion, will not be interfered with on appeal. (*Decter* v. *Stevenson Properties, Inc.,* 39 Cal.2d 407, 419-420 [247 P.2d 11]; *People* v. *Diamond,* 10 Cal.App.3d 798, 801 [89 Cal.Rptr. 126]; *Johnson* v. *Pacific Indem. Co.,* 242 Cal.App.2d 878, 882 [52 Cal.Rptr. 76]; *Estate of Ventura,* 217 Cal.App.2d 50, 63 [31 Cal. Rptr. 490]; *Roberts* v. *Permanente Corp.,* 188 Cal.App.2d 526, 533 [10 Cal.Rptr. 519]; *Dankert* v. *Lamb Finance Co.,* 146 Cal.App.2d 499, 503 [304 P.2d 199].) ■ Proof Monk and Bowers were involved in

an assault upon a taxicab driver with intent to commit robbery without instruction or direction from a third person does not tend reasonably to prove they did not act upon the instruction or direction of defendant in mistreating and killing Billie Jo. In addition, the offer of proof involved an inquiry into collateral issues not justified by the worth of the evidence described in the offer and properly was excluded under the authority conferred upon the court by Evidence Code section 352. (See *People* v. *Lavergne,* 4 Cal.3d 735, 742 [94 Cal.Rptr. 405, 484 P.2d 77]; *Fries* v. *Anderson, Clayton & Co.,* 190 Cal.App.2d 667, 682 [12 Cal.Rptr. 336].)

Defendant also claims the offered evidence was admissible for impeachment purposes under Evidence Code sections 780, 1101, subdivision (b) and 225. This contention also is without merit. Defendant's reliance upon the cited code sections is misplaced (Gen. see Evid. Code, § 787.) In any event, the order denying admission of the offered evidence is supported by the decision in *People* v. *Lavergne, supra,* 4 Cal.3d 735, 742.

We believe the apparent purpose of the offered evidence was to persuade the jury to disbelieve the testimony of Monk and Bowers implicating defendant in the killing of Billie Jo by showing they were despicable men. (Gen. see *People* v. *Diaz,* 206 Cal.App.2d 651, 666 [24 Cal.Rptr. 367], overruled on other grounds in *People* v. *Perez,* 62 Cal.2d 769, 776 [44 Cal.Rptr. 326, 401 P.2d 934].) It was a diversionary tactic. Monk and Bowers, by their own testimony regarding the treatment of Billie Jo, proved they were despicable men.

A witness named Lonczewski testified Monk, in an informal conversation, stated "it didn't bother him to kill anybody; that he had killed a young colored fellow on a plantation that he was on in Louisiana for having stolen a watermelon." There was no objection to admission of this testimony presumably because theretofore Monk, on cross-examination in response to an inquiry by defense counsel, testified he had not told Lonczewski he had killed a colored man in Louisiana. A witness named Messer testified Monk, in the presence of Bowers, showed the witness a newspaper with a story relating Billie Jo's condition when found after she was killed, and said: "We did it—me and a couple of the boys"; that "she pimped on a couple of his friends and he and a couple of boys didn't like it none so they went out and killed her"; and that "she started to break away from them and . . . he broke her arm and then caught her and strangled her." Messer also testified, on another occasion Monk told him "he had killed *a girl* slowly by hanging her upside down" (italics ours); that "he just hangs her upside down and kind of tortures her a

little bit . . . that was his job"; that it "was his job to torture girls like that" for a group known as "Association Road Masters." The evidence indicates the statements on the latter occasion were not related to the killing of Billie Jo. The witness Marler testified Bowers, in the presence of Monk, referring to Billie Jo, said: "*We* already got someone framed you know who is going to take the rap for killing her"; on a later occasion Monk told him "*they* had someone *they* were going to frame for this job," or as stated by the witness in another part of his testimony, "Now, look, we've got somebody we're going to frame, and so I just don't want to hear no more about it"; on the latter occasion Monk was by himself; and "they" never told him "what the name of the man was who they were going to frame for this murder." (Italics ours.) Bowers and Monk denied making any statements either of them was going to frame someone for the murder of Billie Jo.

■ Defendant, directing specific attention to the foregoing testimony by Lonczewski, Messer or Marler, contends the court erred in instructing the jury, during the course of the trial, the testimony by Lonczewski and Messer respecting purported statements by Monk, was subject to the rule "evidence on some former occasion a witness who is not a party to this action made a statement or statements that were inconsistent with his testimony in this trial may be considered by you only for the limited purpose of testing the credibility of the witness. Testimony of such inconsistent statements must not be considered by you as evidence of the truth of the facts as stated by the witness on such former occasion"; and also erred in giving an instruction generally stating the same rule when the jury was instructed at the close of the trial. Defendant's contention the court erred in giving the instructions aforesaid is premised on the claim the statements, although hearsay, were admissible in proof of the truth of the facts related by virtue of Evidence Code section 1235.

When the court instructed the jury the testimony of Lonczewski relating Monk's statement he had killed a person in Louisiana might be considered only for the limited purpose of testing Monk's credibility and not as evidence of the truth of the facts as stated, it determined, in substance, the fact Monk may have killed a person in Louisana was irrelevant to any issue at bench. Under the rules heretofore stated, this determination was proper; was not an abuse of discretion; and supports the limiting instruction.

Likewise implied in the limiting instruction is a determination by the court the facts in the statements by Monk to Messer, wherein the former said he had tortured and killed a girl as part of his job for a club of which he was a member, referring to an incident other than the killing of

Billie Jo which he testimonally admitted, were irrelevant to any issue in the case. For the reasons heretofore noted this determination was proper; was not an abuse of discretion; and supports application of the limiting instruction to those statements.

The statements by Monk to Messer admitting the former's participation in killing Billie Joe and relating incidents in connection therewith, assuming the facts related were true, added nothing of consequence to the testimony of Monk at trial where he admitted and described in detail the method of killing Billie Jo and the mistreatment to which she was subjected by him and by Bowers. Assuming the court erred in limiting the testimony of Messer respecting these statements to a consideration only for the limited purpose of testing Monk's credibility, the error was without prejudice under the rule stated and applied in *People* v. *Watson,* 46 Cal.2d 818, 836 [299 P.2d 243].

Monk and Bowers denied making a statement to Marler they had someone framed who was going to take the rap for killing Billie Jo. Marler's testimony to the contrary was admissible for impeachment purposes. Assuming, as contended by defendant, the testimony in question also was admissible to prove the truth of the facts stated, i.e., "they" had someone framed, we are of the opinion, under the rule stated in *People* v. *Watson, supra,* 46 Cal.2d 818, any error in limiting consideration of the testimony to impeachment purposes was not prejudicial for the reasons hereinafter stated. The statement to Marler did not identify the persons therein designated as "they" nor the person who was framed. Thus the statement is subject to interpretation the word "they" included Monk, Bowers and defendant; and the person who was framed was someone other than defendant. At the time of trial there was no reason for Monk and Bowers to deny making the statement they had someone framed if in fact they had made such a statement, as they already had entered pleas of guilty to the offense and their testimony established they alone committed the physical acts of mistreatment resulting in the killing of Billie Jo. No reason appears why Monk and Bowers should frame defendant so as to make him a party to the offense. If the testimony of Monk and Bowers they acted upon the instruction, direction or order of defendant when they mistreated Billie Jo and killed her was given in execution of a preconceived plan to frame defendant, they were inconceivably kind to him in limiting his participation to instructions, directions and orders; in testifying he left the scene of the killing before it had been accomplished;[1] and in acknowledging commission of the bestial and brutal

---

[1]Both Monk and Bowers testified defendant was not present when they dropped the concrete block on her chest and back.

attack upon Billie Jo. If the jury were to accept as a fact Monk and Bowers framed someone, predicated upon the statement "they" had done so, it would have to accept the testimony of Marler who said Monk and Bowers made the statement to him. In light of this fact, it is unbelievable the jury would not have accepted the testimony of Marler relating statements the defendant made to him which impel the conclusion defendant participated in the plan to kill Billie Jo, participated in the killing and was not the person framed. Marler testified defendant told him, before Billie Jo disappeared, there was an informer in their group; he thought it was Billie Jo; and she had to go. Marler also testified defendant, after Billie Jo's disappearance, told him at least three or four times "they beat her up and punctured her ribs—made it look like a righteous sex crime" because she was an informer, and bragged about "how he done a righteous job." It is not probable the jury would have reached a result more favorable to defendant if the court had not given the instruction about which he now complains.

The defendant's motion to quash the indictment was premised on grounds broader in scope than those urged on appeal. We consider the latter only. His action in the premises constitutes an abandonment of grounds not now urged.

■ The indictment was returned by the 1969 grand jury. Defendant claims, on appeal, (1) the selection of grand jurors was not made from a list prepared by the jury commissioner or court secretary which is the method prescribed by statute; (2) the list in question violated constitutional guarantees because in its preparation persons unwilling to serve were systematically excluded; (3) the legislative grant of power to the district attorney to determine whether to prosecute by indictment or information is void because it does not provide a standard governing the exercise of that power, and for this reason contravenes the due process clause of the federal Constitution; and (4) even though a district attorney has the power to determine whether to prosecute by indictment or information, where he elects to proceed by indictment and the legality of the exercise of his discretion in the premises is attacked he has the burden of showing his choice was not an abuse of discretion, which he failed to do in the case at bench.

In January of 1969, pursuant to Penal Code section 895, the Superior Court of San Diego County made its order designating the estimated number of grand jurors required for the transaction of the business of the court for the ensuing year. Thereafter, pursuant to Penal Code section

896, the court selected and listed 76 grand jurors. The persons selected were proposed by the judges of the superior court, each judge, in his discretion, submitting the names of not more than four persons. In some instances some of the judges did not submit any names. The secretary of the superior court assisted in the mechanics of preparing the list, primarily by furnishing information enabling the judges to propose names in accordance with former Penal Code section 899, which directs a selection from the different judicial districts of the county in proportion to the number of inhabitants therein, and in performing the clerical duties incident to the selection and listing. Pursuant to Penal Code section 904, the court made an order directing 30 grand jurors be drawn. Following this, those drawn were summoned and 19 were chosen as the grand jury, pursuant to Penal Code sections 905, 906 and 908.

In 1969 the County of San Diego had a jury commissioner whose duties were confined to assisting the judges in making a selection of trial jurors. The secretary to the judges of the superior court had not been designated to perform the duties of a jury commissioner.

Defendant contends the grand jury for 1969 "was created" contrary to the governing statutes in the premises, and its action in returning an indictment against him was void, because Penal Code section 903 et seq., respecting the preparation of a list of persons qualified to serve as grand jurors by the jury commissioner of the county, apply to the situation at bench;[2] Penal Code section 903.1 provides for the adoption of written rules by a majority of the judges of the superior court to govern the jury commissioner in the preparation of a list of persons qualified to serve as grand jurors; the judges of the Superior Court of San Diego County had not adopted such written rules; and the Jury Commissioner of San Diego County did not furnish the judges with a list of persons qualified to serve as grand jurors for 1969.

Defendant's contention is premised upon the assumption the selection and listing of grand jurors by the superior court in a county having a jury commissioner may be performed in the first instance only by the jury com-

---

[2]The secretary of the judges testified there was not "a jury commissioner for the grand jury" in San Diego County in 1969, and it was not a part of his duty to perform the functions of a jury commissioner. Nevertheless, both sides, in their briefs, assume a jury commissioner for San Diego County had been appointed; was acting pursuant to section 204a of the Code of Civil Procedure; and his duties under this appointment included assisting the judges in making selections of grand jurors. Our opinion is based on the premise this assumption is correct.

missioner. The provisions of Penal Code section 903 et seq. respecting the duties of a jury commissioner in the preparation of a list of grand jurors permit, but do not require, the judges of the superior court to proceed in the manner there designated. Section 903.1 declares: ". . . [A] majority of the judges of the Superior Court *may* adopt such rules or instructions as may be necessary for the guidance of the jury commissioner, *who shall at all times be under the supervision and control of the judges of the court* . . . ." (Italics ours.) The language used does not impose a mandate on the judges. Section 903.4 provides: "The judges are not required to select any names from the list returned by the jury commissioner, but may, if in their judgment the due administration of justice requires, make all or any selections from among the body of persons in the county suitable and competent to serve as grand jurors regardless of the list returned by the jury commissioner." As the judges may make all selections of grand jurors without regard to any list returned by the jury commissioner, *if in their judgment the due administration of justice requires,* it would be unreasonable to interpret the statute to require them to adopt rules for the guidance of the jury commissioner in the selection of grand jurors and to cause the jury commissioner, who at all times is under the supervision and control of the judges, to prepare a list of persons qualified to serve as grand jurors; and their action in proceeding as in the case at bench dictates the conclusion they determined the due administration of justice required them to make the selection of grand jurors from among the body of persons in the county. (Gen. see *In re Wells,* 20 Cal.App.3d 640, 651 [98 Cal.Rptr. 1]; *People* v. *Teitelbaum,* 163 Cal.App.2d 184, 203 [329 P.2d 157].)

In any event, even assuming the statute required the Superior Court of San Diego County to proceed in accord with the provisions of Penal Code section 903 et seq. in the preparation of an initial list of grand jurors, the failure to conform to the method thus prescribed constituted only an irregularity in the proceeding; the grand jurors drawn from the list prepared by the judges constituted at least a de facto grand jury; and its proceedings resulting in the return of the indictment at bench are deemed valid and entitled to full credit. (*People* v. *Byrd,* 42 Cal.2d 200, 206 [266 P.2d 505], overruled on other grounds in *People* v. *Morse,* 60 Cal.2d 631, 643-649 [36 Cal.Rptr. 201, 388 P.2d 33, 12 A.L.R.3d 810]; *Fitts* v. *Superior Court,* 4 Cal.2d 514, 521 [51 Cal.Rptr. 66, 102 A.L.R. 290].)

■ Preliminary to the selection and listing of grand jurors for the year 1969, the presiding judge of the court for the year 1968 sent a memorandum to each of the judges of the court reminding them of their obligation to submit the names of proposed grand jurors which included the following statement: "Please develop your list of names as soon as

possible and have them delivered to the court secretary. Also, please be reminded that no name is to be submitted unless it has been ascertained that the nominee *is willing to serve and will be able to devote an average of two full days per week of his time to Grand Jury duty."* Defendant contends, by virtue of the foregoing memorandum, persons unwilling to serve were systematically and purposefully excluded from the list of prospective grand jurors in violation of constitutional requirements. (*Whitus* v. *State of Georgia,* 385 U.S. 545, 549-550 [17 L.Ed.2d 599, 603-604, 87 S.Ct. 643, 646]; *Pierre* v. *State of Louisiana,* 306 U.S. 354, 358 [83 L.Ed. 757, 760, 59 S.Ct. 536, 538].)

At this juncture it should be noted defendant had the burden of proving his accusation. (*Whitus* v. *State of Georgia, supra,* 385 U.S. 545, 550 [17 L.Ed.2d 599, 603-604, 87 S.Ct. 643, 646]; *Swain* v. *State of Alabama,* 380 U.S. 202, 205 [13 L.Ed.2d 759, 764, 85 S.Ct. 824, 827]; *People* v. *Carter,* 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *Nero,* 19 Cal.App.3d 904, 911 [97 Cal.Rptr. 145]; *People* v. *Gibbs,* 12 Cal.App.3d 526, 539 [90 Cal.Rptr. 866].) There is no showing any of the judges proposing names of persons for the list followed the suggestion in the memorandum (see *People* v. *Teitelbaum, supra,* 163 Cal.App.2d 184, 203-204); persons unwilling to serve on a grand jury actually were excluded from the list of persons selected by the court; the list consisted only of persons willing to serve; or whether the judges understood the memorandum as a direction not to submit the names of persons who were unwilling to serve and had a valid excuse, the exercise of which would dissipate the number of names submitted, or understood it as a direction not to submit the names of persons unwilling to serve regardless of whether they had a valid excuse. The foregoing status of the record supports the finding of the trial judge hearing the motion to quash when he stated:

"I find as a fact that the judges in selecting the nominees for the 1969 Grand Jury did not discriminate against or exclude any class or grouping of individuals for race, color, age, economic status, education, employment history, *and I am including for any reason.*

"The defendants have failed to show and have failed to sustain their burden of proof that any class . . . has been excluded in the 1969 Grand Jury intentionally, systematically or not. They have failed to show any exclusion at all." (Italics ours.)

In light of this finding, which is supported by the record, defendant's

contention the court systematically and purposefully excluded persons unwilling to serve, lacks factual foundation and must be rejected for this reason alone.

Furthermore, the exclusion from a proposed grand jury list of persons unwilling to serve, per se, does not violate constitutional requirements. Defendant's contention to the contrary is premised upon the rule invalidating a grand jury where, in the selection of jurors, the court systematically and purposefully excludes a class of persons (*Whitus* v. *State of Georgia, supra,* 385 U.S. 545, 549-550; *Pierre* v. *State of Louisiana, supra,* 306 U.S. 354, 356 [83 L.Ed. 757, 759]), and upon the claim persons unwilling to serve constitute such a class. ■ The rule upon which defendant relies is premised upon the concept an impartial jury must be drawn from a cross-section of the community (*Thiel* v. *Southern Pac. Co.,* 328 U.S. 217, 220 [90 L.Ed. 1181, 1184, 66 S.Ct. 984, 985, 166 A.L.R. 1412]; *People* v. *Carter, supra,* 56 Cal.2d 549, 569; *People* v. *White,* 43 Cal.2d 740, 754 [278 P.2d 9]); is based on the conclusion the systematical and purposeful exclusion from a grand jury of a class of persons in the community denies due process and equal protection of the law (*Pierre* v. *State of Louisiana, supra,* 306 U.S. 354, 356; *People* v. *White, supra,* 43 Cal.2d 740, 749); applies only to the exclusion of members of an identifiable group in the community (*Swain* v. *State of Alabama, supra,* 380 U.S. 202, 205; *In re Wells, supra,* 20 Cal.App.3d 640, 649; *People* v. *Newton,* 8 Cal. App.3d 359, 388 [87 Cal.Rptr. 394]); and embraces generally groups identified by race, sex, age, social or economic status, religious belief, educational attainment, political affiliation or geographical background. (*Thiel* v. *Southern Pac. Co., supra,* 328 U.S. 217, 220; *People* v. *White, supra,* 43 Cal.2d 740, 749; *People* v. *Gibbs, supra,* 12 Cal.App.3d 526, 538.) ■ There was no systematic and purposeful exclusion of persons in any of the foregoing groups from the 1969 Grand Jury. As heretofore noted, the trial judge specifically found there was no such exclusion. It is inconceivable exclusion from a grand jury of persons unwilling to serve, of itself, could deny a defendant an impartial jury chosen from a cross-section of the community. We conclude persons unwilling to serve on a grand jury do not constitute an identifiable class in the community, and the exclusion of such persons from a list of prospective grand jurors does not invalidate the selection process unless, under particular circumstances, it equates the exclusion of an identifiable class of persons in the community.

■ In addition, defendant's contention also must be rejected because of the rule stated in *People* v. *White*, *supra*, 43 Cal.2d 740, 753, that: "It is generally recognized that as a general rule, errors and irregularities in making up a jury list will not invalidate the list when the person objecting is not a member of the group discriminated against." (See also *In re Wells*, *supra*, 20 Cal.App.3d 640, 649; *Ganz* v. *Justice Court*, 273 Cal.App.2d 612, 620 [78 Cal.Rptr. 348]; *People* v. *Conley*, 268 Cal.App.2d 47, 59 [73 Cal.Rptr. 673].) ■ There is no showing defendant was a member of a class of persons in the community unwilling to serve on a grand jury.

■ The further contentions of defendant, article I, section 8 of the California Constitution violates the due process clause of the federal Constitution because it does not provide "guidelines as to which offenses are to be prosecuted by information and which are to be prosecuted by indictment" and, in any event, the failure of the district attorney to show why prosecution by indictment in the case at bench was adopted requires a reversal, also are without merit.

Heretofore the courts of this state have held the Constitution and statutes of California authorizing a prosecutor to proceed against an accused either by indictment or information, at his option, are constitutional. (*People* v. *Newton*, *supra*, 8 Cal.App.3d 359, 388, hearing by Supreme Court denied; *People* v. *Rojas*, 2 Cal.App.3d 767, 771 [82 Cal.Rptr. 862]; *Ganz* v. *Justice Court*, *supra*, 273 Cal.App.2d 612, 620.)[3] There is no basis for any requirement the district attorney must, on a motion to quash an indictment, make a showing supporting his selection of the indictment process. Defendant's arguments in support of his contention to the contrary are without merit. ■ The district attorney acts in an administrative

---

[3]Of interest is the fact, until adoption of the 1879 Constitution the only method of prosecuting an accused in the superior court was by indictment (*Sekt* v. *Justice's Court*, 26 Cal.2d 297, 301 [159 P.2d 17, 167 A.L.R. 833]); article 1, section 8 of that Constitution added an alternate method, i.e., by information; over a period of years following adoption of the 1879 Constitution defendants persistently, although unsuccessfully, claimed their prosecution by information rather than by indictment denied them constitutional rights; decisions rejecting these claims declared the constitutional provision provided alternate methods of procedure (*Hurtado* v. *State of California*, 110 U.S. 516 [28 L.Ed. 232, 4 S.Ct. 111, 113]; *Kalloch* v. *Superior Court*, 56 Cal. 229, 237; *People* v. *Washington*, 243 Cal.App.2d 681, 686 [52 Cal. Rptr. 668]; *People* v. *Potter*, 240 Cal.App.2d 621, 629 [49 Cal.Rptr. 892]; *People* v. *Stradwick*, 215 Cal.App.2d 839, 840 [30 Cal.Rptr. 791]; *People* v. *Thwaits*, 101 Cal.App.2d 674, 677 [226 P.2d 58]); defendants, changing their tactics, now claim their prosecution by indictment rather than by information denied them constitutional rights; and, as noted, these claims also have been rejected.

capacity in making his selection and the legality of his action is governed accordingly.[4]

The judgment is affirmed.

Brown (Gerald), P. J., and Whelan, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 16, 1972.

---

[4]A district attorney is part of the executive branch of the government (*County of Yolo* v. *Joyce,* 156 Cal. 429, 432 [105 P. 125]); in the absence of any showing to the contrary it must be presumed he has performed official duty properly (*County of Yolo* v. *Joyce, supra,* 156 Cal. 429, 433; *San Luis Obispo* v. *Hendricks,* 71 Cal. 242, 246 [11 P. 682]); and in the prosecution of criminal charges, he is vested with discretionary authority. (*Ascherman* v. *Bales,* 273 Cal.App.2d 707, 708 [78 Cal.Rptr. 445]; *Taliaferro* v. *City of San Pablo,* 187 Cal.App.2d 153, 154 [9 Cal.Rptr. 445]; *Taliaferro* v. *Locke,* 182 Cal.App.2d 752, 755-757 [6 Cal.Rptr. 813].)