[Civ. No. 14023. Third Dist. May 2, 1974.]

THE PEOPLE, Petitioner, v.
THE SUPERIOR COURT OF NEVADA COUNTY, Respondent;
PETER STEPHEN DEAN, Real Party in Interest.

## COUNSEL

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., and Jack R. Winkler, Chief Assistant Attorneys General, Doris H. Maier, Assistant Attorney General, Arnold O. Overoye, James T. McNally and Eddie T. Keller, Deputy Attorneys General, for Petitioner.

No appearance for Respondent.

Brian M. Sax, Beilock & Sax and Nason & Goldfarb for Real Party in Interest.

## OPINION

**FRIEDMAN, J.**—In October 1972 the Nevada County grand jury indicted Peter Dean on a charge of possessing marijuana for sale. In November of 1973 we denied Dean's petition to quash the indictment; we held that the evidence supporting the indictment had been secured by means consistent with the Fourth Amendment. (*Dean* v. *Superior Court*, 35 Cal.App.3d 112 [110 Cal.Rptr. 585], hg. den. Jan. 3, 1974.) We now confront another phase of the pretrial activity.

One ground for Dean's superior court attack on the indictment was a claim that the 1972 grand jury had been selected by means which resulted in exclusion or underrepresentation of identifiable classes of the county population: the poor, wage earners or blue collar workers, the young, and women. In support of his claim Dean had subpoenas issued for the 19 members of the 1972 grand jury. The Attorney General entered the case on behalf of the People and moved to quash the subpoenas. An assigned judge heard testimony of Honorable Harold Wolters, the superior court judge of Nevada County, who described his practices in selecting grand jury panels.[1] At the close of the hearing the court refused to quash the subpoenas but ordered the 30 members of the grand jury panel to respond to a questionnaire in lieu of appearing in court. The Attorney General then petitioned this court for a writ of prohibition to restrain the superior court from submitting the questionnaire.

The questionnaire, to be answered without revealing the identity of the person responding, is designed to elicit information as to the age and 1971 family income of each of the 30 panel members. A copy of the questionnaire appears in the margin.[2]

---

[1]Except in Los Angeles County, the grand jury consists of 19 members whose names are drawn from a list of 25 to 30 panelists. (Pen. Code, §§ 888.2, 904.) The panelists are selected by the superior court judges, although optional use may be made of a list compiled by the jury commissioner. (Pen. Code, §§ 896, 903-903.4.) Aside from section 899, calling for a geographic spread, the Penal Code supplies no assurance of a panel comprising a cross-section of the county population. The failure of repeated efforts at statutory reform is described in Mar, *The California Grand Jury: Vestige of Aristocracy* (1970) 1 Pacific L.J. 36, 37-40.)

[2] PROPOSED GRAND JUROR QUESTIONAIRE [*Sic.*]

1. What is your age? _____
2. Age of head of your household:

Under 65 yrs. _____
Over 65 yrs. _____

3. Total number of people in your family (include all dependents): _____

■ An accused is entitled to inspection and discovery of evidence in the government's hands, subject to two areas of trial court discretion: discretion to curb disclosures harmful to legitimate governmental interests and discretion to demand a "plausible justification" for the inspection. (*Hill* v. *Superior Court* (1974) 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353]; *Joe Z.* v. *Superior Court* (1970) 3 Cal.3d 797, 804 [91 Cal.Rptr. 594, 478 P.2d 26]; *Ballard* v. *Superior Court* (1966) 64 Cal.2d 159, 167 [49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416].)
■ An appellate court may utilize prerogative writs such as prohibition to annul or limit discovery orders which constitute an abuse of discretion; they should be reserved, nevertheless, for cases of some public importance. (*Pacific Tel. & Tel. Co.* v. *Superior Court* (1970) 2 Cal.3d 161, 169-170 [84 Cal.Rptr. 718, 465 P.2d 854]; Witkin, Cal. Evidence (2d ed. 1966) §§ 1050, 1063.)

Here the subpoenas and questionnaires addressed to the grand jury panel would elicit personal information to facilitate an indicted defendant's complaint of grand jury selection procedures. The vulnerability of grand jurors and panel members to this kind of inquiry without a counterbalancing inquiry into the defendant's actual or potential prejudice opens the door to delaying tactics in criminal cases and discourages Californians from undertaking grand jury service. (Cf. *City of Carmel-By-The-Sea* v. *Young* (1970) 2 Cal.3d 259, 270 [85 Cal.Rptr. 1, 466 P.2d 225, 37 A.L.R.3d 1313].) The problem becomes more pointed because, according to the record, grand jurors in Nevada County spend 95 percent of their time investigating local governmental affairs, only 5 percent of their time on the criminal phase of their work. Thus, at the cost of pretrial delay in a felony prosecution, we issued an order to show cause.

■ Dean asserts a constitutional right to a grand jury composed of a representative cross-section of the county population; contends that he is entitled to obtain evidence in an effort to prove that young adults and persons of low income are excluded or underrepresented as a result of the

---

4. Was your family's total gross yearly income in 1971 less than:
   If "yes" please check appropriate box:

   | | |
   |---|---|
   | $ 1749.00 | _____ |
   | $ 1888.00 | _____ |
   | $ 2194.00 | _____ |
   | $ 2441.00 | _____ |
   | $ 2905.00 | _____ |
   | $ 3721.00 | _____ |
   | $ 4386.00 | _____ |
   | $ 4921.00 | _____ |
   | $ 6034.00 | _____ |

5. If your gross family income in 1971 was *more* than $6034.00, please check here: _____.

   PLEASE DO NOT SIGN OR LEAVE ANY IDENTIFYING MARK.

subjective selection methods employed by the single superior court judge of Nevada County who, under California law, conducts the impanelment process. He points out that the questionnaire is but a step in his challenge to the grand jury; that the challenge is still pending and undecided in the superior court.

The deliberate exclusion of Negroes from grand and petit juries in the southern states was the genesis of the present body of constitutional restraints on impanelment procedures. The federal Supreme Court has repeatedly held that a black defendant is denied equal protection if he is indicted or tried by a grand or petit jury from which blacks have been systematically excluded. (See cases cited, *Peters* v. *Kiff* (1972) 407 U.S. 493, 497, fns. 6, 7, 8 [33 L.Ed.2d 83, 90-91, 92 S.Ct. 2163].) These decisions formed the foundation for a wider body of doctrine, transcending racial discrimination and demanding general community representation on grand and petit juries. Current criteria were summarized in *People* v. *Goodspeed* (1972) 22 Cal.App.3d 690, 703 [99 Cal.Rptr. 696]: "The rule upon which defendant relies is premised upon the concept an impartial jury must be drawn from a cross-section of the community (*Thiel* v. *Southern Pac. Co.,* 328 U.S. 217, 220 [90 L.Ed. 1181, 1184, 66 S.Ct. 984, 985, 166 A.L.R. 1412]; *People* v. *Carter, supra,* 56 Cal.2d 549, 569 [15 Cal.Rptr. 645, 364 P.2d 477]; *People* v. *White,* 43 Cal.2d 740, 754 [278 P.2d 91]); is based on the conclusion the systematical and purposeful exclusion from a grand jury of a class of persons in the community denies due process and equal protection of the law (*Pierre* v. *State of Louisiana, supra,* 306 U.S. 354, 356 [83 L.Ed. 757, 759, 59 S.Ct. 536]; *People* v. *White, supra,* 43 Cal.2d 740, 749); applies only to the exclusion of members of an identifiable group in the community (*Swain* v. *State of Alabama, supra,* 380 U.S. 202, 205 [13 L.Ed.2d 759, 764, 85 S.Ct. 824]; *In re Wells, supra,* 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Newton,* 8 Cal.App.3d 359, 388 [87 Cal.Rptr. 394]); and embraces generally groups identified by race, sex, age, social or economic status, religious belief, educational attainment, political affiliation or geographical background. (*Thiel* v. *Southern Pac. Co., supra,* 328 U.S. 217, 220; *People* v. *White, supra,* 43 Cal.2d 740, 749; *People* v. *Gibbs, supra,* 12 Cal.App.3d 526, 538 [90 Cal.Rptr. 866].)"

In this case the trial court temporarily halted its inquiry into the allegations of discriminatory selection when it directed issuance of the grand jury questionnaire. Consequently there are no findings accepting or rejecting the allegations. Judge Wolters testified that in assembling the 1972 grand jury panel he compiled a list of 30 persons (10 names known to him and 20 persons whose names were suggested by others) whom he believed were qualified by honesty, fairness, reasonable intelligence and

interest in community affairs; that he attempted to achieve a cross-section of persons of various ages, purposely seeking out potential panelists under the age of 30; that most of the younger people could not devote enough time; that he paid no attention to the gender of the selectees;[3] that he attempted to find persons of diverse occupations, was not concerned about panelists' income and made no attempt to seek out poor persons. On the 30-member panel were 2 persons who might be classed as wage earners, a checker at a market and a utility linesman.

The Attorney General views the questionnaire as an invasion of the grand jurors' right of privacy without an overbalancing need for protection of the rights of the accused. He contends that the information sought by the questionnaire is irrelevant; that Dean can succeed only by demonstrating purposeful discrimination over a period of time; that at most the questionnaires will prove only absence of a particular age or economic group from the particular grand jury which indicted Dean; that Dean has no right to have any particular group represented; thus, that the information sought by the questionnaire will not support a claim of purposeful discrimination.

As the Attorney General points out, Dean has no right to a grand jury in which all important population components are represented.[4] Weighty authority, moreover, supports the assertion that the accused has the burden of showing "systematic" or "purposeful" discrimination.[5] A number of courts have thus discounted the significance of statistics bespeaking the socio-economic composition of a single grand jury. Reflecting no more than the age and income levels of a single grand jury, the Nevada County questionnaire is relatively ineffectual to demonstrate systematic, purposeful discrimination against the allegedly excluded or underrepresented groups. We cannot stop at that point, however.

The decisions requiring the accused to show systematic, purposeful dis-

---

[3] Of the 30 panelists 9 were housewives.

[4] *Swain* v. *Alabama* (1965) 380 U.S. 202, 205 [13 L.Ed.2d 759, 764, 85 S.Ct. 824]; *Cassell* v. *Texas* (1950) 339 U.S. 282, 286-287 [94 L.Ed. 839, 846-847, 70 S.Ct. 629]; *Thiel* v. *Southern Pacific Co.* (1946) 328 U.S. 217, 220 [90 L.Ed. 1181, 1184, 66 S.Ct. 984, 166 A.L.R. 1412]; *Montez* v. *Superior Court* (1970) 10 Cal. App.3d 343, 349 [88 Cal.Rptr. 736].

[5] *Whitus* v. *Georgia* (1967) 385 U.S. 545, 550 [17 L.Ed.2d 599, 603-604, 87 S.Ct. 643]; *Swain* v. *Alabama, supra,* 380 U.S. at p. 205 [13 L.Ed.2d at p. 764]; *Hernandez* v. *Texas* (1954) 347 U.S. 475, 476-478 [98 L.Ed. 866, 869-870, 74 S.Ct. 667]; *People* v. *White* (1954) 43 Cal.2d 740, 749-750 [278 P.2d 9]; *In re Wells* (1971) 20 Cal.App.3d 640, 649 [98 Cal.Rptr. 1]; *People* v. *Nero* (1971) 19 Cal. App.3d 904, 910 [97 Cal.Rptr. 145]; *Montez* v. *Superior Court, supra,* 10 Cal.App.3d at p. 349; *People* v. *Newton* (1970) 8 Cal.App.3d 359, 388-389 [87 Cal.Rptr. 394].

crimination do not square with others which condemn discrimination stemming from negligence or inertia. The latter recognize that official compilers of jury lists may drift into discrimination by not taking affirmative action to prevent it. In formulating a panel for a grand jury endowed with the criminal indictment function, officials must adhere to a standard more stringent than mere abstention from intentional discrimination; they have an affirmative duty to develop and pursue procedures aimed at achieving a fair cross-section of the community.[6]

As a consequence, constitutional attack on grand jury composition may be supported by statistics which demonstrate discriminatory result rather than discriminatory design. However ineffectual to prove discriminatory design, the statistics sought by the Nevada County questionnaire would possess some significance as part of a larger body of data intended to show consistently discriminatory results.[7] At this point the issue of Dean's standing to challenge the grand jury becomes pivotal.

Subject to whatever qualifications emanate from the federal Supreme Court's 1972 decision in *Peters* v. *Kiff, supra,* an accused has standing to charge imbalance of the grand or petit jury only if he is a member of the excluded class or otherwise shows a serious probability of bias.[8] Im-

[6]*Avery* v. *Georgia* (1953) 345 U.S. 559, 561 [97 L.Ed. 1244, 1247, 73 S.Ct. 891]; *Cassell* v. *Texas, supra,* 339 U.S. at p. 289 [94 L.Ed. at p. 848]; *Akins* v. *Texas* (1945) 325 U.S. 398, 403 [89 L.Ed. 1692, 1696, 65 S.Ct. 1276]; *Smith* v. *Texas* (1940) 311 U.S. 128, 132 [85 L.Ed. 84, 87, 61 S.Ct. 164]; *Rabinowitz* v. *United States* (5th Cir. 1966) 366 F.2d 34, 56-57; *Brooks* v. *Beto* (5th Cir. 1966) 366 F.2d 1, 12.

Speaking for the court in *Cassell* v. *Texas, supra,* 339 U.S. at page 289, Mr. Justice Reed described the selecting officials' duty "to familiarize themselves fairly with the qualifications of the eligible jurors of the county . . . ." In a separate opinion Mr. Justice Frankfurter declared (339 U.S. at p. 293 [94 L.Ed. at p. 850]): "The purpose may not be of evil intent or in conscious disregard of what is conceived to be a binding duty. Prohibited conduct may result from misconception of what duty requires." Similarly, *Smith* v. *Texas, supra,* 311 U.S. at page 132, banned impanelment methods which produce discrimination "ingeniously or ingenuously."

In *Rabinowitz* v. *United States, supra,* 366 F.2d at page 58, the court stated: "If a fair cross-section is consistently lacking, then, without more, it is established that the [jury] commissioners have failed in their duty."

[7]We do not explore the conceptual basis for the questionnaire set out in footnote 2, *ante.* At oral argument counsel for Dean explained that it had been constructed to reflect the poverty index used by the United States Census Bureau and originated by a Federal Interagency Committee in 1969. (See 1970 Census Users' Guide, p. 108.)

[8]*Fay* v. *New York* (1947) 332 U.S. 261, 287 [91 L.Ed. 2043, 2059, 67 S.Ct. 1613]; *Salisbury* v. *Grimes* (5th Cir. 1969) 406 F.2d 50, 51; *People* v. *Sirhan* (1972) 7 Cal.3d 710, 753 [102 Cal.Rptr. 385, 497 P.2d 1121]; *People* v. *White, supra,* 43 Cal.2d at p. 753; *In re Wells, supra,* 20 Cal.App.3d at p. 649; *Ganz* v. *Justice Court* (1969) 273 Cal.App.2d 612, 619-620 [78 Cal.Rptr. 348].

plicit in the requirement of standing is judicial recognition that an accused may not nullify the criminal proceeding against him for the sake of an abstract claim, even one founded upon the Fourteenth Amendment; rather, he must show some likelihood of injury.[9]

Dean does not claim membership in any of the community segments which are assertedly excluded or underrepresented — the poor, wage earners or blue collar workers, the young, and females. He has an undoubted constitutional right to an impartial grand jury. The likelihood of bias against him or his cause is conjectural, for he shows no difference in decisional outlook between the excluded and included classes. A defendant has no right to a grand or petit jury in which all elements of the population are represented. (See text accompanying fn. 4, *ante*.) Dean's complaint is an abstraction, an assertion that an indictment found by an unrepresentative grand jury is a nullity. The claim is entitled to judicial consideration only if the requirement of standing has been abolished or altered in his favor by *Peters* v. *Kiff*.

In *Peters* v. *Kiff* the federal Supreme Court diverged sharply from the established requirement of membership in the class excluded from the jury. It sustained a Caucasian defendant's post-conviction attack on the systematic exclusion of Negroes from the grand jury which had indicted him and the petit jury which had tried him. Its central holding—that a claim of racial exclusion may be raised by a defendant who is not of the excluded race—is clear enough. The problem is whether *Peters* v. *Kiff* is confined to racial exclusions; or whether it extends to claims of imbalance other than racial. At this point *Peters* v. *Kiff* lacks clear-cut qualities; to the contrary, its lesson is veiled in ambiguity.

*Peters* v. *Kiff* is featured by three opinions (two concurring and one dissenting), each signed by three justices. The dissenting opinion, written by Chief Justice Burger, is clear. It calls for continued rejection of the claims of defendants who are outside the excluded class and who show no serious probability of bias. The concurring opinion of Mr. Justice White is similarly explicit. It utilizes as its starting point the federal statute (18 U.S.C. § 243) prohibiting racial disqualifications for federal or state jury service; views it as a specific implementation of the Fourteenth Amend-

---

[9] *People* v. *Sirhan, supra,* 7 Cal.3d at page 753, adverts to the general rule restricting the objection to a member of the excluded class, declaring: "An exception to the general rule may exist if it appears that the defendant was prejudiced by the asserted purposeful discrimination . . . ." Prejudice, in the form of actual bias, is virtually impossible to prove; it is sufficient if the circumstances create the likelihood or the appearance of bias. *Peters* v. *Kiff, supra,* 407 U.S. at pp. 502, 504 [33 L.Ed.2d at pp. 93-95]; *In re Murchison* (1955) 349 U.S. 133, 136 [99 L.Ed. 942, 946, 75 S.Ct. 623].

ment which evokes a special rule of standing, reflecting the "central concern of the Fourteenth Amendment with racial discrimination" (407 U.S. at p. 507 [33 L.Ed.2d at p. 96]).

The ambiguity is supplied by the leading opinion of Mr. Justice Marshall. It too adverts to the federal statute making racial exclusions from juries a crime. It asserts (407 U.S. at p. 502 [33 L.Ed.2d at pp. 93-94]) that a state cannot consistently with due process subject a defendant to indictment or trial by a jury selected "in violation of the Constitution and laws of the United States," implying that the federal statute is pivotal. At numerous points, nevertheless, the opinion of Mr. Justice Marshall indulges in broad dicta, supplying a verbal basis for a rule transcending racial exclusions and allowing the accused to object to the exclusion of any identifiable segment of the community. It culminates in this declaration (407 U.S. at pp. 504-505 [33 L.Ed.2d at p. 95]): "Accordingly, we hold that, whatever his race, a criminal defendant has standing to challenge the system used to select his grand or petit jury, on the ground that it arbitrarily excludes from service the members of any race, and thereby denies him due process of law. This certainly is true in this case, where the claim is that Negroes were systematically excluded from jury service. For Congress has made such exclusion a crime. 18 U.S.C. § 243."[10]

Although preceded by a number of broad dicta, Justice Marshall's culminating paragraph firmly restricts his holding to racial exclusions, narrowing but not abolishing the demand for the accused person's membership in the excluded group. Moreover, as a minority opinion, the Marshall opinion is without binding precedential force. (*Eaton* v. *Price* (1960) 364 U.S. 263 [4 L.Ed.2d 1708, 80 S.Ct. 1463]; *People* v. *McKinnon* (1972) 7 Cal.3d 899, 911 [103 Cal.Rptr. 897, 500 P.2d 1097].) The six concurring and dissenting justices showed no disposition to relax the rule of standing in nonracial cases.

*Peters* v. *Kiff* is not alone in viewing racial balance as a specially assured

---

[10]An example of the broad generalizations employed by the leading opinion in *Peters* v. *Kiff* en route to its relatively narrow holding is the following: "The principle of the representative jury was first articulated by this Court as a requirement of equal protection, in cases vindicating the right of a Negro defendant to challenge the systematic exclusion of Negroes from his grand and petit juries. [Citation.] Subsequently, in the exercise of its supervisory powers over federal courts, this court extended the principle, to permit any defendant to challenge the arbitrary exclusion from jury service of his own or any other class. [Citations.] Finally it emerged as an aspect of the constitutional right to jury trial in *Williams* v. *Florida*, 399 U.S. 78, 100 . . . (1970)." (407 U.S. at p. 500, fn. 9 [33 L.Ed.2d at p. 92].)

The preceding statement was quoted as *ratio decidendi* in *People* v. *Jones* (1973) 9 Cal.3d 546, 549-550 [108 Cal.Rptr. 345, 510 P.2d 705], without apparent recognition that it was dictum extracted from a minority opinion.

guarantee. In *Fay* v. *New York, supra,* the majority opinion of Mr. Justice Jackson refers to the federal statute punishing racial exclusion from federal and state juries, declaring that "Congress has put these cases in a class by themselves" and that: "For us the majestic generalities of the Fourteenth Amendment are thus reduced to a concrete statutory command when cases involve race or color which is wanting in every other case of alleged discrimination." (332 U.S. at pp. 282-283 [91 L.Ed. at p. 2057].)

When applied to imbalances other than racial, the leading opinion in *Peters* v. *Kiff* is singularly unpersuasive. In his dissenting opinion Chief Justice Burger observed that "[t]he opinion of Mr. Justice Marshall seeks to magnify [a] wholly speculative likelihood of prejudice . . . ." (407 U.S. at p. 510 [33 L.Ed.2d at p. 98].) The public has a deep and vital stake in the timely and effective administration of criminal justice. Viewed as an invitation to challenge the grand jury on a claim of imbalance affecting the accused only as a member of the general community, the *Peters* v. *Kiff* dicta would make felony indictments the springboards of test cases and place defense lawyers under ethical pressures to transform criminal courts into statistical battlefields. That sort of invitation flies in the face of Justice Cardozo's warning against "gossamer possibilities of prejudice." (*Synder* v. *Massachusetts* (1934) 291 U.S. 97, 122 [78 L.Ed. 674, 686-687, 54 S.Ct. 330, 90 A.L.R. 575].) Justice Cardozo amplified the warning: "Privileges so fundamental as to be inherent in every concept of a fair trial that could be acceptable to the thought of reasonable men will be kept inviolate and inviolable, however crushing may be the pressure of incriminating proof. But justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true." (*Id.*)

In preference to the minority dicta in *Peters* v. *Kiff,* we adhere to the position of the six concurring and dissenting justices. We understand their position to be this: Where racial balance is not in issue, the rule of standing remains unaffected; the accused may not assign discriminatory impanelment practices as a ground of attack on the criminal prosecution unless he is a member of the excluded class or otherwise shows a likelihood of bias.

Insistence upon standing as a prerequisite to attack on the indictment does not ignore the community's interest in fair selection procedures. The California Penal Code's flaccid directions for grand jury selection contain no effective assurance of broad socio-economic representation. (See fn. 1, *ante.*) The continued absence of meaningful statutory controls only burdens the courts with repeated attacks on grand jury selection methods.

Although an unrepresentative grand jury may not prejudice the individual defendant, it is detrimental to community aspirations and incompatible with the egalitarian aims of the Fourteenth Amendment. When discriminatory methods damage the community and not the accused, a representative lawsuit is available to redress the community's wrong.[11] To put the matter concretely, California superior court judges are subject to civil process to compel constitutionally sanctioned grand jury selections; only in relatively limited cases will a criminal court provide an appropriate forum. No judicial abdication of constitutional responsibility results when a criminal court rejects the pretrial claim of an accused who shows no justiciable injury. (See *Ganz* v. *Justice Court, supra,* 273 Cal.App.2d at p. 618.)

Constitutional principles protect the privacy of public officials and functionaries against forced disclosures not impelled by public need. (*City of Carmel-By-The-Sea* v. *Young, supra,* 2 Cal.3d at pp. 268-270; *People* v. *Nero, supra,* 19 Cal.App.3d at pp. 909-910.) True, the Nevada County questionnaires permit anonymity. The right of privacy includes both protection against unwarranted disclosures and protection of one's control of his personal affairs, that is, the right to be "let alone." (*Gill* v. *Curtis Publishing Co.* (1952) 38 Cal.2d 273, 276 [239 P.2d 630]; see 77 Yale L.J. 475, 482 (1968).) The Nevada County questionnaires interfere with grand jurors' control over personal financial information without a gossamer possibility of prejudice as a counterweight. In ordering the questionnaires, the trial court abused its discretion by compelling disclosure of the panelists' personal affairs without any showing of plausible justification on the part of the accused.

Let a writ of prohibition issue restraining the respondent court from submitting the questionnaires to members of the 1972 grand jury panel of Nevada County.

Richardson, P. J., and Janes, J., concurred.

A petition for a rehearing was denied May 16, 1974, and the petition of the real party in interest for a hearing by the Supreme Court was denied June 26, 1974. Mosk, J., was of the opinion that the petition should be granted.

---

[11]Challenges to the socio-economic composition of grand juries originated with defendants in criminal cases in the procedural setting of appeal or habeas corpus. The objection later became available as the basis of class actions to correct unfair selection procedures. *Carter* v. *Jury Commission* (1970) 396 U.S. 320, 329 [24 L.Ed.2d 549, 557, 90 S.Ct. 518]; *Turner* v. *Fouche* (1970) 396 U.S. 346 [24 L.Ed.2d 567, 90 S.Ct. 532]; see Comment (1973) 20 U.C.L.A. L.Rev. 581.