[Crim. No. 26294. Second Dist., Div. Two. Aug. 25, 1975.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIE CLARENCE CHAPMAN, Defendant and Appellant.

**COUNSEL**

Ronald V. Skyers, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Cynthia S. Waldman and Kent M. Bridwell, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**COMPTON, J.**—Appeal from a judgment of conviction entered on a jury verdict finding defendant guilty of murder in the second degree.

### FACTS

Sometime after 10 p.m. on December 6, 1971, a Mr. Tyler who resided at 4166 South Wall Street in Los Angeles, observed three men in the street outside of his residence. One of the three was Jerry Moreland, the victim in this case.

When Mr. Tyler first saw the three, one was holding Moreland while the other was administering a physical beating to him. When Moreland went to the ground, the assailant commenced to kick him in the head and face. Both men were hollering at Moreland to "Get up," or "Give it up."

Subsequently his two attackers lifted Moreland to his feet and forced him to a location between two houses from where the sound of a gunshot emanated, after which the two ran from the location. Moreland later staggered out onto the street where he collapsed and died.

An autopsy revealed that the cause of death was a gunshot wound in the heart, the location and direction of which indicated that it had been fired while the victim was lying on the ground and the slayer standing over him. The fatal bullet was a .22 caliber long rifle bullet, the nose of which had been previously flattened or filed to fit a gun chambered for a short cartridge.

Police investigation at the scene of the incident revealed blood on the rain gutter of a home next to the point where the fatal shot was apparently fired. A palm print was lifted from that rain gutter at a point about five feet above the ground.

Three impartial witnesses who observed various phases of the incident all verified the fact that there were only two persons involved in the crime. Mr. Tyler, who had an excellent opportunity to observe the perpetrators positively identified defendant as the individual who had done the initial striking and kicking of Moreland.

The defendant was arrested on January 12, 1972, on an unrelated charge. At the time of his arrest he was at the home of his uncle Seth Graves, approximately two blocks from the scene of the homicide.

In conjunction with the arrest the officers recovered 21 rounds of .22 caliber long-rifle ammunition, four of which had their noses filed or flattened in a manner similar to the fatal bullet. The officers also recovered a jacket belonging to defendant, which jacket contained traces of dried blood of the same blood type as Moreland. Defendant's blood is of another type. Finally the palm print lifted from the rain gutter was established to be that of the defendant.

Defendant testified at the trial and gave his version of what had occurred. According to defendant, at about 10 p.m. on December 6, 1971, he was at the home of one Charlotte Goodwill on 40th Place between Main and Broadway. Among those present at that location were his brother Robert and one Napoleon Banks. Later defendant, Robert and Banks were walking in the direction of Seth Graves' residence when they were accosted by Moreland, the victim, who sought to purchase some drugs. Subsequently, a fight broke out between Banks and Moreland, which eventually moved to the side of the house where defendant's palm print had been found. Defendant contended that he had hold of Moreland in an attempt to break up the fight and in so doing placed his hand against the side of the building.

Defendant claimed that the jacket which had the victim's blood on it belonged to his brother Robert and that Banks was wearing it on the night of the killing. Defendant proclaimed that he had never carried a gun.

Defendant's testimony was proven to be false in several particulars. First, it was established that Charlotte Goodwill had moved from the location on 40th Place three days before the incident. Secondly, the jacket in question had defendant's name "Willie" written on the inside. Thirdly, it was established that defendant was arrested on December 25, 1971, carrying a loaded revolver in his waistband. At the time of that arrest he was wearing the jacket in question. Lastly, as noted, three disinterested witnesses disputed defendant's claim that there were three persons besides the victim present at the scene. In sum, the evidence of defendant's guilt as a participant in the killing of Moreland was overwhelming.

### ISSUE ON APPEAL

Defendant makes only one contention of arguable merit and that is that the trial court erroneously prevented him from producing evidence that Banks had stated to other persons that he, Banks, was the one who shot Moreland and that defendant had tried to break up the fight.

Upon the defendant's proffering of this evidence the trial court conducted a hearing out of the presence of the jury. During the course of the hearing, Banks was called to the witness stand and refused to testify invoking his privilege against self-incrimination.

Defendant produced one Geary Hewitt who testified that he had been in the Los Angeles County jail from May through August of 1972, and during that period had been in a position to be in contact with Banks, the defendant's brother Robert, and defendant, all of whom were also incarcerated. During an evening's discussion of their respective cases, Banks, according to Hewitt, stated that he had shot someone named "Melvin" or "Moreland" and that the defendant had tried to break up the fight. Hewitt did not know the location of the incident.

One Joel Grimes testified that he was also an inmate at the county jail at the time and occupied a cell next to Banks and Hewitt. He claims to have heard Banks say he had shot someone in the chest and that "Chapman" had been present at the time.

Seth Graves, defendant's uncle, testified that during December 1971, Banks had been in Graves' home and in the presence of Banks' girlfriend Joyce Jones stated that during an encounter with an unknown person he

had ". . . let him have it in the stomach." Joyce Jones in her testimony refuted this evidence.

The prosecution for its part indicated that it was prepared to show that Banks had stated to Grimes that "he would take the beef because he is going to the YA and he couldn't get hurt; . . ." and that Banks had stated to a correctional counselor at Vacaville that Willie and Robert Chapman had asked him to testify falsely on their behalf and had threatened to "get him" if he refused. We point this out at this time to indicate the complex and convoluted nature of the evidence on the point.

The trial court after hearing the testimony ruled the evidence inadmissible as untrustworthy and not meeting the requirements for admission as declarations against penal interests. The court cited Evidence Code section 352 as authority for its ruling.

## DISCUSSION

The resolution of this issue involves the effect and the interrelation of Evidence Code sections 352, 403, 405 and 1230.

In *People* v. *Spriggs,* 60 Cal.2d 868 [36 Cal.Rptr. 841, 389 P.2d 377], a case which is factually much different than the case at bar, the California Supreme Court, in a break with long-standing California precedent, held that a declaration against penal interest by a declarant other than the defendant was a type of admissible hearsay because it carried an element of trustworthiness which characterized other previously admitted types of hearsay evidence.

Evidence Code section 1230, in removing the hearsay objection to declarations against penal interest, requires that the witness be unavailable (a witness who properly claims a privilege against self-incrimination is unavailable) and that the declaration be one that when made so far subjected the declarant to the risk of "criminal liability . . . *that a reasonable man in his position would not have made the statement unless he believed it to be true.*" (Italics added.)

The emphasized portion of the above quoted statute is codification of the requirement of trustworthiness as a condition precedent to the admissibility of such declarations. (See Witkin, Cal. Evidence (2d ed. 1966) § 534, p. 507.)

Leaving aside for the moment the evidence and the role of the judge on the issue of whether Banks, the alleged declarant, in fact uttered the declaration and assuming arguendo that the declaration was uttered, we conclude that Evidence Code section 1230 creates a preliminary factual determination to be resolved by the judge pursuant to Evidence Code section 405. ■ A preliminary fact is one upon "the existence or nonexistence of which depends the admissibility or inadmissibility of evidence." (Evid. Code, § 400.) Evidence Code section 405 vests the court with the authority to make certain determinations as to the existence or nonexistence of preliminary facts and admit or exclude proffered evidence on the basis of those determinations. In such situations, the judge's determination is final and where the ruling is to exclude the evidence, it does not go to the jury.[1]

A prime example of the type of preliminary factual questions to be decided under Section 405 is the trustworthiness of a proffered hearsay declaration. For example, the voluntariness of a confession, the spontaneity of an alleged spontaneous declaration or the presence of a sense of impending death at the time of an alleged dying declaration are the types of determination upon which the trial judge's preliminary determination is final. We include in this list the trustworthiness of an admission against penal interest.

■ In making a preliminary determination of the trustworthiness of the declaration against penal interest, the judge may take into account not just the words uttered but in determining whether a "reasonable man in [declarant's] position would not have made the statement unless he believed it to be true," the judge may consider the circumstances under which the declaration was uttered and may analyze the possible motivation of the declarant and his relationship to the defendant on the case.[2]

---

[1]According to the comment by the Assembly Committee on the Judiciary contained in West's Annotated California Code on Evidence at pages 277-279: "Section 405 deals with evidentiary rules designed to withhold evidence from the jury because it is too unreliable to be evaluated properly or because public policy requires its exclusion. . . . When hearsay evidence is offered, two preliminary fact questions may be raised. The first question relates to the authenticity of the proffered declaration—was the statement actually made by the person alleged to have made it? The second question relates to the existence of those circumstances that make the hearsay sufficiently trustworthy to be received in evidence . . . . Under this code, questions relating to the authenticity of the proffered declaration are decided under Section 403. . . . But other preliminary fact questions are decided under Section 405."

[2]We note that Federal Rules of Evidence, title 28, United States Code Annotated section 804(b)(3) [28 U.S.C.S. § 804(b)(3)] requires proof of corroborating circumstances which clearly indicate trustworthiness. This is an indication of the general suspicion with which the law looks upon such declarations.

 Banks allegedly made two hearsay declarations:

(1) That he shot Moreland;

(2) That the defendant was trying to break up the fight.

The first, which is ostensibly against Banks' penal interest, was not exculpating of the defendant since other evidence would fasten liability on the defendant as a principal in the crime regardless of who fired the fatal shot. The second declaration while exculpating of the defendant was not distinctly against Banks' penal interest. (See *People* v. *Traylor*, 23 Cal.App.3d 323 [100 Cal.Rptr. 116].) In either case the trial judge's determination of untrustworthiness is well supported by the evidence and we will not disturb it.

The record here strongly suggests the existence of a plan by three fellow prisoners to have one person take the blame for another's crime under circumstances where the one taking the blame could not suffer any real detriment to his own interests.

Evidence Code section 403 is a corollary to section 405 and provides that ". . . evidence is inadmissible unless the court finds that there is evidence sufficient to sustain a finding of the existence of the preliminary fact, when: . . . (4) The proffered evidence is of a statement or other conduct of a particular person and the preliminary fact is whether that person made the statement or so conducted himself."

The legislative comment to this section seems to suggest that if a hearsay declaration is relevant and there is some evidence that the declarant in fact uttered it that evidence regardless of its probity must go to the jury. In other words, the judge may not assess credibility of the witnesses nor weigh the evidence on the issue of authenticity. We need not decide here the question of the scope of review of a trial court's finding that the evidence is insufficient to sustain a finding of the preliminary fact (see for example, *LeGrand* v. *Yellow Cab Co.*, 8 Cal.App.3d 125 [87 Cal.Rptr. 292], where such a finding was approved) since we are of the opinion that the overriding effect of Evidence Code section 352 disposes of the issue here.

Evidence Code section 352 vests the trial court with discretion to exclude evidence if its probative value is outweighed by the probability that its submission would "create substantial danger of undue prejudice,

of confusing the issues, or of misleading the jury." ■ In a criminal case evidence which simply points to a possible grounds of suspicion against another person is generally rejected as inadmissible. (*People* v. *Buono,* 191 Cal.App.2d 203 [12 Cal.Rptr. 604]; *People* v. *Arline,* 13 Cal.App.3d 200 [91 Cal.Rptr. 520].) "[T]he prosecution as well as the defendant is entitled to protection of the court from prejudicial evidence." (*People* v. *Arline, supra,* at p. 205; also see *People* v. *Lavergne,* 4 Cal.3d 735 [94 Cal.Rptr. 405, 484 P.2d 77]; *People* v. *Goodspeed,* 22 Cal.App.3d 690 [99 Cal.Rptr. 696].)

■ We have previously noted the complexity and intricate nature of the evidence offered and the avenues of impeachment open to the prosecution had the trial court permitted the authenticity of Banks' declaration to go to the jury. The possibility of confusing the issues and misleading the jury is patent.

"Probative" is defined in Black's Law Dictionary (4th ed.) as "Testimony carrying quality of proof and having fitness to produce conviction of truth . . ." Thus in applying Evidence Code section 352, the trial court in weighing "probative value" necessarily considers, among other things, credibility of the witnesses who testify to the proffered evidence.

Thus we conclude that beyond the trial court's proper determination under Evidence Code section 405 of the preliminary fact of the untrustworthiness of the alleged declaration, it was also well within its discretion in excluding the evidence under section 352. The evidence offered as to the fact that Banks made the statement, because of its lack of "probative" value, could have at best only raised a possible suspicion that Banks and not defendant actually fired the fatal shot, a fact which if proved, would not have exculpated defendant and would have served to mislead the jury.

Defendant was fairly tried and we are convinced that no miscarriage of justice occurred.

The judgment is affirmed.

Fleming, Acting P. J., and Beach, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 23, 1975.