[No. A037962. First Dist., Div. One. Apr. 24, 1989.]

THE PEOPLE, Plaintiff and Respondent, v.
DOUGLAS ALLAN STEELE, Defendant and Appellant.

[No. A041686. First Dist., Div. One. Apr. 24, 1989.]

In re DOUGLAS ALLAN STEELE on Habeas Corpus.

**[Opinion certified for partial publication.\*]**

---

* Pursuant to California Rules of Court, rule 976.1, this opinion is certified for partial publication. The portion to be published follows.

**COUNSEL**

Richard Jay Moller, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Laurence K. Sullivan and Linda James, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**NEWSOM, J.**—Douglas Allan Steele (hereafter Steele) appeals from convictions for multiple sex offenses. He was tried on an indictment charging four counts of rape (Pen. Code, § 261, subd. (2)), four counts of forcible oral copulation (Pen. Code, § 288a, subd. (c)), and one count of kidnapping

(Pen. Code, § 207) with an allegation of having kidnapped for purpose of committing a sexual offense (Pen. Code, § 667.8). After four days of deliberations, the jury rendered a verdict of guilty on two counts of rape, two counts of forcible oral copulation, and the single count of kidnapping. It further found that the kidnapping was for the purpose of committing a sexual offense.

On February 18, 1987, the court sentenced Steele to a total term of twenty-three years consisting of two consecutive upper terms of eight years for the rape convictions, two consecutive terms of two years (one-third of the midterm) on both forcible oral copulation convictions, a concurrent and stayed upper term of seven years on the kidnaping conviction, and a consecutive term of three years on the enhancement to the kidnapping conviction.

Steele, a 29-year-old carpenter residing in Oregon, committed the alleged offenses on December 27, 1985, while visiting his parents in Fortuna, California. The victim, Michelle M. (hereafter Michelle), a high school student in Eureka, California, was 14 years old.

According to Michelle's account, she was spending the night with a friend, Christine K. (hereafter Christine) who lived in the town of Alton near Eureka. The two girls went to the Round Table Pizza Parlor in Fortuna where they met two of Christine's male friends, boys named "Lynn" and Mike H. (hereafter Mike). When the parlor closed at 12 midnight, they walked to an acquaintance's house a half-mile away and stayed for about one and one-half hours. During this time, Michelle had sexual intercourse with Mike. Lynn left the house on his own, and the other three persons tried unsuccessfully to get a ride back to Alton. Eventually, they decided to walk to Alton along Highway 101.

After a few minutes, Mike waved his thumb at a passing Ford pickup truck driven by Steele. After being promised a ride, Christine and Mike jumped into the back of the truck but Michelle was not quick enough. The truck took off "really fast" as she stepped on the bumper, causing her to fall to the ground and strike her head. Despite a dizzy and aching head, she picked herself up and began to walk along the side of the road. In about five minutes, Steele pulled up and offered to take her where he had dropped her friends off. She refused to enter the truck, but Steele grabbed her arm and forcibly pulled her inside by way of the passenger door.

Steele drove off the highway onto a dirt road and stopped at a kind of storage site with large metal tanks. Both he and Michelle got out of the truck. He picked her up by the shoulders and carried her behind the metal

tanks where he undressed her and pushed her onto a pile of "sand and mud and a little rock." He then engaged in sexual intercourse.

After walking her back to the car, he set her clothes on the floor of the truck and began to drive. After a few minutes, he stopped again and, pushing her head toward his genitals, forced her to orally copulate him. When he ejaculated, she threw up "spit and semen" on his lap, and he used her sweater to wipe himself off. Michelle testified that she later vomited an unspecified number of times by putting her head "over the seat."

A short while later, he stopped the truck again and told her to slide over to the driver's side and lie on her stomach with her buttocks raised. He then had sexual intercourse a second time. Resuming the driver's seat, he forced her to orally copulate him again as he drove around the environs of Alton. He next stopped at a parking area for logging equipment and compelled her to sit on his lap so that he could have sexual intercourse a third time. Once again he began to drive around the town while forcing her to orally copulate him. Later, he stopped the truck, instructed her to lie on her back, and while threatening to assault her with a broken bottle, engaged in sexual intercourse a fourth time.

Michelle testified that Steele finally allowed her to dress. As he put on his own pants, a small pocket knife fell to the floor. Michelle picked it up and put it in her pocket. As they reached the outskirts of Alton—about two and a half hours after Michelle was first pulled into the truck —Steele's truck ran out of gas. After helping him push it off the road, Michelle ran off to the home of her friend, Christine. Finding no one at home, she pounded on the door of a neighbor, Leanne Shaw, and asked her to call the police.

When Deputy Lonnie Lawson of the Humboldt County Sheriff's Department reached the house, Michelle "was crying, visibly shaken, bordering on hysterical . . . ." Since Steele had borrowed the stalled truck from his parents, the license number permitted police to locate him at his parents' home at about 7 a.m. At a later interview in the police station, he was asked if he had a pocket knife. He said he did but couldn't retrieve it from his pocket. Michelle's friends, Christine and Mike, corroborated her story. They had jumped off the truck and fled when it later stopped on the highway. But Mike saw the truck turn around and drive back down the highway in the direction it had come. Christine walked to the home of her uncle who drove her in a fruitless search for Michelle.

The physical evidence provided only limited confirmation of Michelle's account. There were small stains on the back of her sweater and the fly area of Steele's pants. A criminologist testified that the stains consisted of a

mixture of saliva and semen. A sample taken from the sweater was adequate to permit electrophoresis and blood-type testing. The identifying characteristics, found in only 5.5 percent of the population, were consistent with those found in Steele's blood samples and inconsistent with those of Mike. In contrast, a smear slide and vaginal swabs failed to reveal the presence of semen in the victim's vagina. But a pubic hair found in her underwear was similar to samples taken from Steele, and a medical examination the next day revealed a "little" tenderness in external portions of her vagina.

The site of the first alleged rape did not reveal any signs of a struggle or sexual activity. Cast impressions of shoe prints and tire tracks proved to be inconsistent with Steele's shoes and vehicle. Leanne Shaw did not notice any mud on Michelle's clothes when she arrived at her home. The examining physician similarly did not observe scratches or dirt on her body: he saw only minor injuries to her head and wrist attributable to her fall from the truck. Though the truck was impounded, it did not yield any evidence of vomit or sexual activity.

Taking the witness stand, Steele gave an account of the incident that was generally consistent with the physical evidence and the testimony of witnesses other than Michelle herself. He had spent the evening with friends and had consumed a number of gin and tonics as well as wine with dinner. While he was driving home in his parents' pickup truck around 2 a.m., he saw three people hitchhiking on Highway 101 near Fortuna. He allowed them to jump into the rear of the truck and started down the highway but soon stopped about a mile and a half down the road when he heard them shouting. The hitchhikers told him that a girl had fallen out and they began to walk down the highway in search of her. He turned the truck around and drove back to search for the girl.

Seeing Michelle walking by the side of the road, he invited her into the truck and offered to give her a ride. When they didn't find the other hitchhikers on the highway, he drove her to Christine's home. Finding the door locked, Michelle asked him to search some more for her friends. After an unsuccessful search, he stopped at the first alleged rape site to relieve himself. He and Michelle then talked for some time in the car, and they "were getting pretty friendly, ended up starting kissing and hugging each other, caressing each other." He helped her unzip his pants, and she orally copulated him. Afterwards, he tried to take her to Christine's home, but ran out of gas near Alton. She decided to walk and he called his mother to ask for a ride.

The trial presented the jury with the choice of two sharply differing accounts. In his motion for new trial, Steele claimed to have discovered

evidence lending credibility to his own testimony: two affidavits suggesting that Michelle pursued a pattern of promiscuous behavior. An affidavit of Xavier Marino avers that he met Michelle for the first time in the company of Christine at the Round Table Pizza Parlor on December 26, 1985—the day before the alleged rape. He drove them back to Alton where Christine "proceeded to enter a residence." He remained in the vehicle with Michelle and engaged in sexual intercourse. A second affidavit of Brian Richter accuses Michelle of having the reputation of "going to bed with anyone any time" and states that he was present when Christine introduced Michelle to Marino. This latter affidavit can be easily dismissed, since reputation testimony is inadmissible hearsay, and the remainder of the affidavit provided only minor corroboration of Marino's statements. The Marino affidavit, however, merits some careful analysis.

Code of Civil Procedure section 657 provides, in pertinent part, that a new trial may be granted on the ground of "[n]ewly discovered evidence, material for the party making the application, which could not, with reasonable diligence, have discovered and produced at the trial . . . ." ■ Since the early case of *People* v. *Sutton* (1887) 73 Cal. 243, 247-248 [15 P. 86], the courts have analyzed this language as creating a five-part requirement: " 'To entitle a party to a new trial on the ground of newly discovered evidence, it must appear,—"1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." . . .' " (*People* v. *Martinez* (1984) 36 Cal.3d 816, 821 [205 Cal.Rptr. 852, 685 P.2d 1203].) ■ A motion for new trial based on this ground is generally viewed with " 'distrust and disfavor.' " (8 Witkin, Cal. Procedure (3d ed. 1985) § 32, p. 432.) ■ And a ruling denying the motion will be set aside on appeal only "on a showing of clear abuse." (*People* v. *McDaniel* (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843].)

Denying the motion for new trial, the trial court ruled that the evidence was cumulative and would not have been likely to make a different result probable on retrial. With respect to the cumulative nature of the evidence, the court's finding appears to rest on the testimony of Michelle and Mike revealing that they had met for the first time on the night of the rape and later had sexual intercourse. This testimony had already given the defense the opportunity to argue before the jury that Michelle's promiscuity made Steele's testimony credible. The inference that the evidence would not make a different result probable was also based on its cumulative nature: "[I]t is cumulative to like evidence presented and considered by this jury. As such,

and on review of the evidence now proferred, [*sic*] this Court concludes the evidence is not such as to render a different result probable on retrial of the cause."

Weighing against the court's inference was the fact that the jury apparently had a hard time reaching a decision in the case. In four days of deliberations, it repeatedly asked for rereading of testimony and requested instructions on a variety of matters, including what would happen if they couldn't reach a unanimous verdict. The jury ultimately rejected Michelle's testimony with respect to three of the nine counts. (Her own testimony failed to support a further charge, the fourth count of oral copulation.) The courts have sometimes alluded to the closeness of a case in finding error to be prejudicial. (*People* v. *Washington* (1958) 163 Cal.App.2d 833, 846 [330 P.2d 67]; *People* v. *Wagner* (1975) 13 Cal.3d 612, 621 [119 Cal.Rptr. 457, 532 P.2d 105]; *People* v. *Collins* (1968) 68 Cal.2d 319, 332 [66 Cal.Rptr. 497, 438 P.2d 33, 36 A.L.R.3d 1176].) By the same logic, it can more easily be inferred that newly discovered evidence would affect the outcome of a case where the verdict represented a close and difficult decision.

██ ██ But in the present case, we do not need to decide whether the trial court abused its discretion in denying the motion for new trial on the ground that the newly discovered evidence was cumulative. We conclude that, whether cumulative or not, the evidence would be inadmissible at trial. Evidence Code section 1103, subdivision (b)(1), provides: "Notwithstanding any other provision of this code to the contrary, and except as provided in this subdivision, in any prosecution under Section 261 . . . of the Penal Code, or under Section . . . 288a . . . of the Penal Code . . . opinion evidence . . . of specific instances of the complaining witness' sexual conduct, or any of such evidence, is not admissible by the defendant in order to prove consent by the complaining witness." Subdivision (b)(4) provides, however, that the subdivision should not be construed to bar evidence attacking the complaining witness's credibility: "Nothing in this subdivision shall be construed to make inadmissible any evidence offered to attack the credibility of the complaining witness as provided in Section 782." Evidence Code section 782 establishes a procedure for offering evidence of prior sexual conduct for the purpose of attacking the credibility of the complaining witness. The offer of evidence must be in a written motion, accompanied by an affidavit, and the court must hold a hearing outside the presence of the jury before ruling the evidence admissible.

These provisions of the Evidence Code must be reconciled with Penal Code section 1127d, subdivision (b), which broadly prohibits a jury instruction to the effect that sexual conduct is relevant to credibility: "A jury shall not be instructed that the prior sexual conduct in and of itself of the

complaining witness may be considered in determining the credibility of the witness . . . ." The key to harmonizing Penal Code section 1127d with the Evidence Code lies in the qualifying phrase "in and of itself." The phrase indicates that evidence other than "sexual conduct in and of itself" may still be admissible in attacking the credibility of the complaining witness.

The statutes present us with an extremely difficult task of interpretation. First, Evidence Code section 1103 creates a distinction between evidence tending to prove consent and evidence attacking the witness's credibility, but in reality evidence of prior sexual conduct is likely to have some relevance for both purposes. Second, it is not easy to give concrete application to the obscure concept, incorporated in Penal Code section 1127d, of "sexual conduct in and of itself." Two recent cases, however, support a distinction between evidence of prior sexual conduct offered to prove the character of the complaining witness and evidence of such conduct offered on a noncharacter theory. (*People* v. *Rioz* (1984) 161 Cal.App.3d 905, 914-919 [207 Cal.Rptr. 903]; *People* v. *Varona* (1983) 143 Cal.App.3d 566, 569-570 [192 Cal.Rptr. 44].) Character evidence will be inadmissible either as evidence offered to prove consent under Evidence Code section 1103, subdivision (b)(1), or as evidence of "sexual conduct in and of itself" within the meaning of Penal Code section 1127d. But noncharacter evidence relevant to the witness's credibility may still be admissible even though involving prior sexual conduct. In an insightful analysis, Letwin explains this concept of admissible noncharacter evidence: "[W]hen the evidence is offered on a noncharacter theory, the *mere* fact of prior sexual conduct is never in itself important. It becomes important only when linked with other facts that prove, for example, modus operandi or motive to lie. Put another way, it is not the fact of prior sexual activity as such that is important, but something about the special circumstances under which that prior sexual activity took place that renders it important." (Letwin, *"Unchaste Character," Ideology, and the California Rape Evidence Laws* (1980) 54 So.Cal.L.Rev. 35, 71.)

The evidence offered here appears to fall within the prohibition of Evidence Code section 1103, subdivision (b)(1), as evidence offered to prove consent. By tending to show the complaining witness's pattern of promiscuous behavior, it permits an inference that she consented to sexual activity on the occasion of the alleged offense. Like other such evidence, it also has some relevance to her credibility. The fact that she engaged in intercourse with a stranger in a vehicle the day before the alleged offense suggests a predisposition to have sex with strangers in vehicles; to this extent, it casts doubt on her testimony of being forcibly abducted and sexually abused. But this predisposition, we believe, relates essentially to her character and thus falls within the provision of Penal Code section 1127d relating to "sexual conduct in and of itself." Steele argues that the evidence is admissible on a

noncharacter theory because it tends to prove a modus operandi of engaging in sexual intercourse with strangers in vehicles. His interpretation of the statute appears correct. But the evidence itself—consisting of one prior occasion of sexual intercourse in vaguely parallel circumstances—falls well short of actually indicating such a modus operandi. We accordingly find no error in the trial court's ruling.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .*

The judgment of conviction is affirmed and the matter is remanded for resentencing in accordance with the views expressed herein.

The petition for writ of habeas corpus having made out a prima facie case for relief (*In re Hochberg* (1970) 2 Cal.3d 870, 873-874, fn. 2 [87 Cal.Rptr. 681, 471 P.2d 1]), we have, by separate order, directed the Director of the Department of Corrections to show cause before the Humboldt County Superior Court why the petition should not be granted.

The superior court may defer resentencing pending the outcome of the habeas corpus proceeding.

Racanelli, P. J., and Holmdahl, J., concurred.

---

*See footnote, *ante*, page 67.