[No. A048169. First Dist., Div. Four. Nov. 20, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
KENNETH JACKSON, JR., Defendant and Appellant.

COUNSEL

Dale Dombkowski, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, John H. Sugiyama, Assistant Attorney General, Ronald E. Niver and Mary A. Roth, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POCHÉ, Acting P. J.**—Defendant, Kenneth Jackson, Jr., appeals from a judgment of conviction entered on a jury verdict finding him guilty of

attempted murder (Pen. Code, §§ 187, 664) and of assault with a firearm (Pen. Code, § 245, subd. (a)(2)), with findings on both counts that he personally used the firearm and did so with the intent to inflict great bodily injury (Pen. Code, §§ 12022.5, 12022.7).

The incident giving rise to the charges occurred late in the evening of October 1, 1988, on the campus at the University of California at Berkeley. The victim, Joel Dickson, was a Berkeley football player, who with other members of the team was attending a postgame dance at the Bear's Lair. Defendant, who was not a student at the university, came to the dance where he met some friends, specifically Lamont Butcher, Carlos Garcia, Greg Tolbert, and Ferris Foreman.

Defendant and another acquaintance initiated a conversation with a young woman who turned out to be the pregnant wife of one of the football players, James Devers. Words were exchanged and the two groups continued to keep an eye on one another. Devers enlisted the support of Joel Dickson, his 262-pound teammate, in case the situation escalated into a fight.

After the dance ended both groups moved outside onto a plaza area. Once they were outside Dickson was approached by a very skinny man who wanted to know if Dickson had any "static" with him. Dickson said only if the skinny fellow wanted some. Dickson was also challenged by Garcia who wanted to know why Dickson was looking at him. Another man standing on a nearby planter box joined in the conversation telling Dickson, "No, we have no problem with you." Moments later Dickson was shot twice with .32-caliber bullets.

## The Trial

The prosecution presented numerous witnesses who identified defendant as having been at the dance and involved in the altercation with Devers. Some of those witnesses positively identified defendant as holding the gun from which two shots were fired. Other witnesses placed defendant in the vicinity of the source of the gunshots, but were unable to identify him as the shooter. Another witness saw a man on the planter box with an Uzi, but could not identify the shooter, though he believed the Uzi was not the source of the shots.

The prosecution also offered the testimony of Sheila Fields. According to Fields defendant had told her in a phone call that he and Tolbert and two friends had gone to a party where a football player grabbed Tolbert and defendant had shot and then Tolbert had shot.

At the dance defendant, Garcia, and Tolbert had paid a photographer to take Polaroid photographs of them. One of these photographs was in evidence showing how defendant and his friends were dressed. Tolbert was wearing a white sweat suit with black sleeves and had his hair in short jheri curls. According to defendant he was wearing a tan silk suit with cream leather on the shoulders, and Bali shoes without socks, and had his hair pulled back into a ponytail.

Defendant's version of events was that while he had been present, Gregory Tolbert, not he, was responsible for the shooting. He acknowledged his presence at the dance and testified that he was sitting on a planter box at the time of the shooting. According to him, while the exchange with Dickson was taking place a companion handed defendant an Uzi. Having taken the large gun, defendant tried to keep it from view by holding it down at his side. By his account the .32 bullets which struck Dickson, came not from the .9 millimeter Uzi he held, but from a revolver fired by Gregory Tolbert. Tolbert was killed in an unrelated incident prior to trial.

## Discussion

On appeal defendant contends that the judgment must be reversed because of the cumulative impact of several errors, the net effect of which was to deny him a fair trial. The first of these errors was the prosecutor's failure to disclose the statement of a witness, Dana Dorhan, who belatedly came forward to tell the Berkeley campus police that he had witnessed the shooting and that the shooter was Gregory Tolbert. Dorhan claimed to have known both defendant and Tolbert casually. He explained that he had not come forward sooner because he feared retaliation from Tolbert, but after reading a campus newspaper account of the trial he decided he needed to talk with the authorities.

Dorhan came to the police at 2 p.m. on August 23, 1989. The campus police told the prosecutor about Dorhan's statement at 5 p.m. that same day.[1] About an hour earlier the jury had begun deliberating. It returned its verdicts the following afternoon. Only on September 7, 1989, did the prosecutor disclose to the defense the existence of Dorhan and his statement.

At that juncture the defense moved for a new trial, basing its motion in part upon the prosecution's failure immediately to disclose Dorhan's statement. The motion for new trial was denied and defendant was sentenced.

---

[1] At the motion for new trial the campus police officer was asked about his phone conversation with the district attorney, "Did you tell him [the D.A.] what that person had said?" To which the officer replied, "Yes." "Did you relay to him the facts that that individual relayed?" Answer: "I told him I was still investigating the facts and I would let him know what the results were going to be." "Did you tell him that this person had said that Gregory Tolbert had done the shooting?" Answer: "Yes."

 The prosecution's duty to disclose "extends to all evidence that reasonably appears favorable to the accused, not merely to that evidence which appears likely to affect the verdict." (*People* v. *Morris* (1988) 46 Cal.3d 1, 30, fn. 14 [249 Cal.Rptr. 119, 756 P.2d 843].) When the prosecution suppresses evidence which is material to guilt or punishment, regardless of whether that suppression is intentional or inadvertent, the defendant's due process rights are abridged. (*Brady* v. *Maryland* (1963) 373 U.S. 83, 87 [10 L.Ed.2d 215, 218, 83 S.Ct. 1194]; *People* v. *Ruthford* (1975) 14 Cal.3d 399, 406 [121 Cal.Rptr. 261, 534 P.2d 1341, A.L.R.4th 3132].)[2]

 The People contend that the statement offered by Dorhan as of August 23 when the prosecution learned of it was not evidence but was merely a lead or clue which had not been adequately investigated or substantiated. The gist of the argument is that the prosecution had no duty to disclose Dorhan's statement until the campus police officers had an opportunity to investigate its reliability. We reject this contention out of hand. The statement of an alleged eyewitness to the shooting who knew both defendant and Tolbert by sight and who asserted Tolbert was the shooter, was evidence reasonably favorable to the accused which triggered the prosecutor's duty to disclose.[3]

On appeal, however, the question before us is whether Dorhan's statement was material evidence. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*United States* v. *Bagley, supra,* 473 U.S. at p. 682 [87 L.Ed.2d at p. 494].) Exculpa-

---

[2]Nonetheless, the failure to disclose relevant evidence does not require a per se rule of reversal. (*People* v. *Ruthford, supra,* 14 Cal.3d at p. 409.) First, the defendant must show that the withheld evidence was substantial, material evidence. (*Ibid.*) Denial of due process under the federal constitution occurs "if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." (*United States* v. *Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 491, 105 S.Ct. 3375]; see *People* v. *Morris, supra,* 46 Cal.3d at p. 30, fn. 14 [materiality requirement imposed on review, but not necessary to trigger duty to disclose].) No reversal is required, however, if the prosecution can demonstrate that its failure to disclose is harmless beyond a reasonable doubt. (*People* v. *Ruthford, supra,* 14 Cal.3d at p. 409.)

[3]In addition the prosecutor had an independent duty arising from the standing discovery order in Alameda County Superior Court to disclose "forthwith," not after he completed an investigation. He did not come close to meeting either obligation: the jury had been deliberating for approximately an hour and a half when the prosecutor learned of Dorhan's statement but the prosecutor remained silent for two weeks.

The standing discovery order in Alameda Superior Court provides in pertinent part that it "be deemed a continuing and ongoing order through the completion of trial, so that any items granted by this Order, which are actually or constructively obtained by or become known to the District Attorney of Alameda County or any of his deputies, investigators, or employees, after initial compliance with this Order has been made, shall also be made available forthwith to defense counsel."

tory evidence, in this case testimony from an eyewitness who knew both Tolbert and defendant and claimed to have seen Tolbert fire the shots, can scarcely be characterized as not material in a case where the defense theory was that Tolbert, not defendant, was the shooter. Furthermore, since Dorhan purported to have known both defendant and Tolbert for some years prior to the incident, his identification of the shooter was potentially more credible and reliable than identifications made by witnesses to whom both men were strangers. We can only conclude that suppression of Dorhan's statement did undermine confidence in the outcome of the trial and was material. We understand the dissenting opinion to agree with this analysis and conclusion.[4]

## Tolbert's Admission

Defendant sought to introduce evidence that some 30 minutes after the shooting he was in a Richmond bar with Gregory Tolbert, Petey Ferris Foreman and Lamont Butcher, all of whom had been at the dance. Defendant said to Tolbert, "Greg, 'You shot that guy.' " To which Tolbert replied, " 'No, I don't think I hit him.' " The defendant persevered, " 'No, I think you shot the guy. He was a big brother.' " Tolbert responded, " 'Well, I don't care. He was a bully.' " Defendant offered his own testimony and that of Lamont Butcher to this conversation.

In order to admit evidence that a third party committed a crime the evidence needs to be such as to raise a reasonable doubt as to defendant's guilt. (*People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1017 [254 Cal.Rptr. 586, 766 P.2d 1]; *People* v. *Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].) "The evidence must meet minimum standards of relevance: 'evidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' [Citation.]" (*People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1017.) Such evidence, however, may still be excluded under Evidence Code section 352.[5] (*People* v. *Hall, supra,* 41 Cal.3d at pp. 833-835.)

Evidence of declarations against penal interest is admissible as an exception to the hearsay rule. (§ 1230; *People* v. *Campa* (1984) 36 Cal.3d 870, 882 [206 Cal.Rptr. 114, 686 P.2d 634].) Such declarations must be "distinctly" against the declarant's penal interest and must be "clothed with

---

[4]At page 1683 of the dissenting opinion the text reads: "Turning to the legal issues, the majority opinion may well be correct in holding that the potential evidence of Dana Dorhan should have been disclosed at once."

[5]All further statutory references are to the Evidence Code unless otherwise indicated.

indicia of reliability." (*People* v. *Shipe* (1975) 49 Cal.App.3d 343, 354 [122 Cal.Rptr. 701].) The existence of circumstances which make the statement trustworthy is a preliminary factual finding made under section 405. (See Cal. Law Revision Com. com., Deering's Ann. Code Evid., § 405 (1986) p. 152.)

Whether a statement is one against penal interest is a preliminary fact to be determined under section 405. (*People* v. *Huggins* (1986) 182 Cal.App.3d 828, 832 [227 Cal.Rptr. 547].) The test imposed is an objective one—would the statement subject its declarant to criminal liability such that a reasonable person would not have made the statement without believing it true.[6] (*Ibid.*; 1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 6.1, pp. 259-260.) ▮ Surely a reasonable man would not respond to the repeated assertion that he had shot someone with "Well, I don't care. He was a bully" without expecting that such a statement could subject him to criminal liability. Similarly a reasonable person would not admit that he shot toward a person by explaining "I don't think I hit him." Nor is it self-evident that such statements made very shortly after the crime to a group of friends all of whom had been at the scene are inherently unreliable. In sum, the proffered evidence meets the requirements of section 405.

However, the trial court also excluded the evidence under section 352 finding it to be more prejudicial than probative. The trial court was certainly

---

[6]Once the objective test of whether a reasonable person would make such a statement unless he or she believed it to be true is applied to the cases cited by the dissent the rationale of those cases becomes clear. Likewise, it becomes clear why those cases do not apply to these facts.

In *People* v. *Chapman* (1975) 50 Cal.App.3d 872 [123 Cal.Rptr. 862], the trial court excluded testimony from three witnesses all of whom claimed to have heard declarant, one of the participants in a murder, take responsibility for the shooting. (*Id.* at pp. 877-878.) Declarant had also made statements that he had been threatened by defendant and defendant's brother that they would get him unless he testified falsely in their favor. Under those circumstances a reasonable man might well falsely admit responsibility for a crime out of fear, especially in light of the fact that the declarant was a juvenile offender who, as the court noted, could take the blame and "not suffer any real detriment." (*Id.* at p. 880.)

One of the two excluded witnesses in *People* v. *Love* (1977) 75 Cal.App.3d 928 [142 Cal.Rptr. 532], was Guidry, a man to whom the declarant owed a debt. The declarant's admission to Guidry was highly suspect since it was apparently coupled with an offer to pay the debt from the proceeds of the robbery, which in fact turned out to be missing from their hiding place when the two went to claim them. (*Id.* at pp. 935, 941.) A reasonable man in the presence of an insistent creditor might well admit to a robbery he had not committed in hopes of convincing the creditor that he had the present ability to pay.

Finally in *People* v. *Blankenship* (1985) 167 Cal.App.3d 840 [213 Cal.Rptr. 666], defendant was precluded from testifying to an admission made by a fellow jail inmate who was awaiting trial for robbery and murder. (*Id.* at pp. 847-848.) Here again the declarant failed the reasonable person test: a fellow inmate might well make such a statement knowing it to be false in hopes of helping defendant without fear that he himself could be subjected to more liability than he was already facing for a pending murder charge.

correct in determining that the evidence was strongly probative. It met the requirements of section 350 and *People* v. *Hall, supra.* It was relevant to defendant's guilt and was direct evidence that Tolbert fired shots at Dickson. Without Tolbert's statement, the only direct evidence that Tolbert did the shooting was defendant's testimony.

Just as obviously the trial court was incorrect as a matter of law in concluding that the evidence was prejudicial. ██ "[A] defendant's due process right to a fair trial requires that evidence, the probative value of which is *stronger* than the *slight-relevancy* category and which tends to establish a defendant's innocence, cannot be excluded on the theory that such evidence is prejudicial to the prosecution." (*People* v. *Reeder* (1978) 82 Cal.App.3d 543, 552 [147 Cal.Rptr. 275].) ██ Here, evidence of Tolbert's statements made some 30 minutes after the shooting in the presence of 3 other people was prejudicial only in the sense that it cast doubt on the prosecution's case against defendant.

The court also found Tolbert's statement to be prejudicial because it was cumulative to defendant's assertion that Tolbert did the shooting.[7] As the dissent concedes even the prosecution acknowledged there was evidence Tolbert was present at the crime scene and might have fired. Thus the issue of whether Tolbert or Jackson shot Mr. Dickson was the heart of the case. We find exclusion of Tolbert's statement under section 352 to have been a serious abuse of discretion.

The dissenting opinion would authorize the keeping of this testimony from the jury on three grounds. The first is the testimony could be a lie that could not be refuted by the declarant who had died before the trial. We know of no rule that excludes testimony on the ground that it could be a fabrication, nor are we aware of any rule that buries declarations with the declarant. Nor, given the obvious talent of the prosecutor in alerting the jury in respect to the credibility of witnesses, is this well settled state of the law of evidence a matter of concern. It is the duty of the trier of fact to assess credibility. "Objection, your honor, this could be perjury!" has not yet made it into the Evidence Code.

The second reason suggested in the dissenting opinion for exclusion is that "a reasonable person in Tolbert's position would not have *necessarily* considered that the statement subjected him to the risk of criminal liability." (Dis. opn., *post*, at p. 1686; italics added.) The dissent argues that because the statement "was made to two members of the group that had forced a

---

[7]The trial court commented that "[t]he defendant has already testified that he observed the shooting. The jury has got that information."

confrontation at a party" and to defendant who was holding an Uzi at the time of the shooting none "of these persons was likely to report Tolbert to the authorities." (Dis. opn., *post*, at p. 1686.) Unfortunately the facts belie this theory. Very soon after Tolbert's barroom statement, Tolbert is worried about exactly what the dissent contends he was not worried about: he tells Raymond Hawkins to convey a message to defendant that if "Tolbert's name came up, that there would be trouble for [defendant]." Apparently Tolbert was genuinely worried that defendant would report him to the authorities.

The final reason given by the dissent is that the motivation Tolbert had in speaking may have been to exculpate himself from criminal liability. Tolbert's statement can be read as exculpatory *only* if both defendant and Tolbert shot at Dickson. Assuming that set of facts, Tolbert's comment still was a concession that if his shot did hit Dickson, he didn't care because Dickson was a bully. Tolbert was, at most making a claim of provocation, but he was definitely not making a statement which was "exculpatory in the sense that [he] . . . blamed a coparticipant for the commission of the greater offense while admitting complicity to some lesser degree." (*People* v. *Shipe, supra,* 49 Cal.App.3d 343, 354.) Nor, of course, was the statement a self-serving confession made only after declarant was in custody. (*Ibid.*)

### Testimony of Raymond Hawkins

■ Finally, defendant objects to the exclusion of testimony from Raymond Hawkins that Gregory Tolbert told Hawkins to convey a threat to defendant. Hawkins was the brother of a close friend of defendant.

Defendant offered the evidence not for the truth of Tolbert's statement, but for the nonhearsay purpose of showing Tolbert's consciousness of his guilt for the shooting. Defendant contends that the trial court erred by excluding this evidence under sections 405 and 352, on a finding it was "unreliable" and "untrustworthy."

Because the evidence was offered for a nonhearsay purpose it was not subject to the factual determination of section 405. Such evidence may, of course, be excluded if it is irrelevant (§ 350) or if it is more prejudicial than probative (§ 352). Here the court initially refused to admit the evidence on grounds of relevance. However, it apparently conceded the relevance of the evidence and ultimately excluded it as more prejudicial than probative.

Here the appropriate inquiry by the trial court was "whether this evidence could raise a reasonable doubt as to defendant's guilt and then [whether] section 352 [applied]." (*People* v. *Hall, supra,* 41 Cal.3d at p. 833.) Hawk-

ins's testimony, if found credible by the jury, would have been circumstantial evidence linking Tolbert to the shooting and would have corroborated defendant's testimony that he saw Tolbert commit the shooting. This testimony from a witness other than defendant was thus not excludible as being merely cumulative and its exclusion was a clear abuse of discretion.

## Conclusion

While the evidentiary errors we have identified, might not, standing alone, be sufficient to require reversal of defendant's conviction (§ 354), their cumulative impact is. The effect of the three errors placed appellant all by himself in testifying that Tolbert had been the shooter. Had the three errors not occurred the jury would have heard: (1) a witness other than defendant testifying that he watched as Tolbert, not defendant, shot the victim; (2) a witness other than defendant testify that minutes after the shooting Tolbert admitted shooting but denied hitting the victim with his shots; (3) a witness other than defendant testify that shortly after the shooting Tolbert instructed him to tell defendant that if "Tolbert's name came up there would be trouble for the defendant." Because of these errors, the prosecutor was able to emphasize in his summation that *only* defendant had identified Tolbert as the shooter. "What witness has come to this courtroom and said conclusively that Gregory Tolbert is the shooter? Only one. The defendant. He is the only one." Absent corroborating evidence the prosecution could and did discount defendant's testimony as self-serving and unworthy of belief. The prosecutor characterized it as "the dead guy defense. Let's pass it off on the dead guy."

Because evidence corroborating defendant's version of events was excluded and because defendant never learned of the existence of Dana Dorhan, the one other eyewitness who claimed to have seen Tolbert commit the shooting, we can only conclude that there was a miscarriage of justice such as to require reversal of this conviction. (Cal. Const., art. VI, § 13; *People* v. *Ramos* (1982) 30 Cal.3d 553, 581 [180 Cal.Rptr. 266, 639 P.2d 908].)[8]

The judgment is reversed.

Reardon, J., concurred.

---

[8]At oral argument the Attorney General conceded that if the three alleged errors were found to be error their cumulative impact would require reversal.

**PERLEY, J.**—I respectfully dissent.

In my opinion the majority's statement of facts places more emphasis than is justified on an equal responsibility for the confrontation which led to Dickson being shot. Certainly, the football players, their friends, relatives and supporters were at the dance to celebrate the victory of the Berkeley football team. On the other hand, the defendant, Greg Tolbert, Lamont Butcher, Carlos Garcia, and Ferris Foreman were not students at the university or ardent supporters of the team and their actions indicate that they came as a group with the intent to cause trouble.

Thus, they brought at least two guns, a .32-caliber handgun and an Uzi. Further, they openly and deliberately sexually harassed a woman who was seven months pregnant, while she was peacefully dancing with a man who identified himself as her husband. When the married couple moved to the other side of the room, defendant's group continued to behave in a confrontational manner toward the football players until the shooting occurred. One member of defendant's group, Carlos Garcia, also harassed another woman at the victory party.

I further believe that the majority opinion fails to sufficiently emphasize that the bulk of the nine-day trial consisted of conflicting identification testimony regarding whether defendant was *one of the persons* who fired at Dickson.

As stated by the prosecutor in his opening statement: "As anyone might expect in a tragic shooting incident of the type of facts that I have outlined to you the testimony will establish, there are bound to be some people who are able and some people who are unable to identify positively the defendant as being the person that shot Mr. Dickson. There is also some evidence that in addition to the defendant, there was yet another man, a friend of the defendant's who was at the scene who had a gun and who also shot at Mr. Dickson." Thus, the prosecution conceded that Tolbert might also have fired at Dickson. The defense was that Tolbert alone fired.

A key prosecution witness testified that in a telephone conversation defendant told her that he and Tolbert shot a football player at a party.

In other prosecution evidence, four eyewitnesses identified defendant as the shooter, in court, in the following manner. Outside linebacker Albert D. Odom identified him without qualification. Defensive back John Hardy testified that two shots came "[f]rom the hand of the defendant." The victim, defensive tackle Joel Dickson testified that he was shot by a man standing on a planter box and he was "[a] hundred percent sure" that defendant was on

the planter box at that point. Latina Johnson observed defendant extend his arm while he was holding a gun in his hand. She turned to run away and heard two shots.

At a live lineup prior to trial Odom, Hardy, and Johnson identified defendant without qualification as the shooter. Dickson was 70 percent to 80 percent sure. Each of these witnesses had earlier selected defendant's picture when shown a group of polaroid photographs taken at the Bear's Lair on the night of the shooting. Odom was 50 percent sure; Dickson "said he looks like the one who shot me."

Johnson tracked down a photograph of defendant at his high school. However, the four witnesses were not always able to identify defendant in photographic lineups using different pictures of him.

The defense presented three eyewitnesses who contradicted the prosecution identifications. Defendant testified that he observed Tolbert fire two shots at Dickson. Defendant did not fire any shots although one of his group handed him an Uzi at the time of the incident.

Latitia Bradford saw a man on the bench with a shiny metal object that appeared to be a weapon and heard a clicking noise. When she started to walk away she heard shots. Bradford did not see defendant outside at that time. Bradford was shown the series of Polaroid photographs and she selected Tolbert as the man on the bench. Keith Hodges, a friend of the football players, appears to have seen two guns and two or three people around the planter boxes. Hodges observed two shots being fired and while he was running from the scene he heard one or two more.

Turning to the legal issues, the majority opinion may well be correct in holding that the potential evidence of Dana Dorham should have been disclosed at once. However, the "real issue" is whether defendant was prejudiced by the absence of the evidence. (*People* v. *Frohner* (1976) 65 Cal.App.3d 94, 108 [135 Cal.Rptr. 153].) No reversal is called for unless defendant suffered prejudice; no prejudice occurs if the evidence was cumulative. (*People* v. *Morris* (1988) 46 Cal.3d 1, 34-35 [249 Cal.Rptr. 119, 756 P.2d 843].)

"To entitle a party to a new trial on the ground of newly discovered evidence, it must appear, . . . 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause. . . ." (*People* v. *Steele* (1989) 210 Cal.App.3d 67, 73 [257 Cal.Rptr. 687], citations and quotation marks omitted.)

"Numerous cases hold that a motion for a new trial should be granted when the newly discovered evidence contradicts the strongest evidence introduced against the defendant." (*People* v. *Martinez* (1984) 36 Cal.3d 816, 823 [205 Cal.Rptr. 852, 685 P.2d 1203].) Evidence which supports the testimony of the defendant is not cumulative at least when it is the only evidence for the defense. (*People* v. *Ah Lee Doon* (1893) 97 Cal. 171, 178 [31 P. 933].) However, evidence which merely contradicts eyewitness testimony may be cumulative. (*People* v. *Trujillo* (1977) 67 Cal.App.3d 547, 556 [136 Cal.Rptr. 672].)

In the present case the jury had to choose between conflicting identification testimony. Four eyewitnesses identified defendant. One witness testified to the effect that defendant and Tolbert fired. Two eyewitnesses identified Tolbert. One eyewitness testified to the effect that there were two shooters. Two of the three defense witnesses were completely impartial. Thus, any additional eyewitness testimony would be cumulative.

Turning to Tolbert's alleged statement. In order to be admissible the statement would have to be a declaration against penal interest under Evidence Code section 1230. The majority concludes that the test of whether the statement falls within the statute "is an objective one—would the statement subject its declarant to criminal liability such that a reasonable person would not have made the statement without believing it true" (maj. opn., *ante*, at p. 1678). In support of this conclusion they cite 1 Jefferson, California Evidence Benchbook (2d ed. 1982) section 6.1, pages 259-260.

The full test enunciated in Jefferson is: would a reasonable person "in declarant's position" have considered that the statement subjected him to the risk of criminal liability. (1 Jefferson, Cal. Evidence Benchbook (June 1990 Supp.) pp. 98-99.) Several guiding principles have been developed by the cases to assist courts in applying this somewhat nebulous test.

"The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant. [Citations.]" (*People* v. *Frierson* (1991) 53 Cal.3d 730, 745 [280 Cal.Rptr. 440, 808 P.2d 1197].)

A statement will not be admitted if under all the circumstances the declarant's reasonable motivation was to exculpate himself even if the

resulting statement was inculpatory. (*People* v. *Coble* (1976) 65 Cal.App.3d 187, 191 [135 Cal.Rptr. 199].) "The decision whether trustworthiness is present requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception." (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1251 [270 Cal.Rptr. 451, 792 P.2d 251].)

"The litmus test of determining the admissibility of the extrajudicial statement under section 1230 is whether the declarant should have realized or did realize *that the statement when made was distinctly against his penal interest* [citation]." (*People* v. *Johnson* (1974) 39 Cal.App.3d 749, 761 [114 Cal.Rptr. 545], italics in original.) A trial court's ruling will be upheld "absent a clear error of law or manifest abuse of discretion." (*People* v. *Love* (1977) 75 Cal.App.3d 928, 941 [142 Cal.Rptr. 532].)

These rules have been applied to facts similar to the facts herein in the following cases.

In *People* v. *Chapman* (1975) 50 Cal.App.3d 872 [123 Cal.Rptr. 862], the defendant was convicted of murder. He testified to the effect that Banks had killed the victim. (*Id.* at p. 876.) Statements by three witnesses that Banks had admitted the killing were excluded. Two witnesses heard the admission while they were in jail with Banks and the third was the defendant's uncle. The prosecution had evidence that Banks had also stated that " 'he would take the beef because he is going to the YA and he couldn't get hurt' " and that Banks had been pressured to testify by threats from the defendant. (*Id.* at pp. 877-878.)

The Court of Appeal affirmed because the "record here strongly suggests the existence of a plan by three fellow prisoners to have one person take the blame for another's crime under circumstances where the one taking the blame could not suffer any real detriment to his own interests." (*People* v. *Chapman, supra*, 50 Cal.App.3d at p. 880.)

In *People* v. *Love, supra*, two codefendants were convicted of robbery. One testified that Walton committed the robbery. (75 Cal.App.3d at p. 932.) Testimony of two witnesses that Walton admitted the robbery to them was excluded. (*Id.* at pp. 934-935.) The judgment was affirmed because one witness was a friend of defendant and Walton, the statement to the witness was incomplete, and it was not made until two months after the robbery. Walton owed money to the other witness and "a likelihood existed that any such confession, even if made, would have been fabricated by Walton to avoid his payment of his debt." (*Id.* at pp. 940-941.)

In *People* v. *Blankenship* (1985) 167 Cal.App.3d 840, 847-848 [213 Cal.Rptr. 666], the defense offered a statement by the defendant that Gary Hahn confessed to the charged robbery and attempted murder while both were in the county jail. Hahn was awaiting trial for other offenses. The appellate court affirmed the exclusion of the evidence as follows: "As the proposed testimony was to come from defendant himself it was highly suspect both because defendant had a motive to falsify and because accurate details concerning the crime could be explained by defendant's own knowledge and guilt rather than Hahn's." (*Id.* at p. 849.)

Herein, the alleged statement from Tolbert was suspect on at least two grounds. First, since Tolbert was dead by the time of the trial, defendant and his friend Butcher could have easily made it up in order to protect defendant without jeopardizing any of the living members of their group.

Second, taking the statement at face value, a reasonable person in Tolbert's position would not have necessarily considered that the statement subjected him to the risk of criminal liability. It was made to two members of the group that had forced a confrontation at a party and defendant was holding an Uzi at the time of the shooting. Thus, neither one of these persons was likely to report Tolbert to the authorities.

Finally, the motivation for the statement appears to be exculpatory. Approximately 30 minutes after Tolbert left a place where one of his group had shot another person, defendant accuses him of the crime. Tolbert denies the accusation. When pressed by defendant, Tolbert gives an evasive answer. Under all the circumstances a reasonable view of the colloquy is that defendant is attempting to divert suspicion from himself by blaming Tolbert while Tolbert is maintaining his innocence.

Accordingly, the trial court did not abuse its discretion in rejecting the evidence and there was no clear error of law. In support of their opinion the majority state: "Nor is it self-evident that such statements made very shortly after the crime to a group of friends all of whom had been at the scene are inherently unreliable." (Maj. opn., *ante*, at p. 1678.) Metaphysically speaking the majority may be correct, but this court's burden is not to determine self-evident truth, but rather to determine whether an abuse of discretion occurred.

The final conclusion by the majority opinion was that evidence of a threat by Tolbert was improperly excluded. Here again I disagree. Defendant's girlfriend, Sheila Fields, testified that in October 1988, she was threatened over the telephone that if she testified against defendant she would be killed. Defendant was not the caller. In July 1989, her door was kicked in and two

windows were broken. Johnson received several phone calls where the person just stayed on the line without speaking, and her front room window was broken on February 14, 1989, the day before the preliminary hearing. Defendant testified that on the Friday night after the incident, Tolbert told defendant that if the police found out where Tolbert was staying, Tolbert would shoot defendant. Thus, the evidence was cumulative.

Further, it is undisputed that Tolbert was present at the scene of the crime and might have fired shots at Dickson. Thus, he would have sought to keep his name from the police whether or not he actually fired the shots which hit Dickson.

Accordingly, I would affirm the judgment.