MANSFIELD, Justice
(concurring in part and dissenting in part).
Although I join most of the court’s opinion, I cannot agree with Part IV, and I would not order a third trial of this case. I do not think the district court’s handling of the Michelle Zwank hearsay testimony was improper.
I am persuaded by the alternative reasoning of either the court of appeals or the district court concerning Zwank’s testimony. According to Zwank, a couple of days before Lance Morningstar’s disappearance, Louis Woolheater told her that Morningstar knew something that could get Woolheater in trouble and land him in jail. This is the Woolheater out-of-court statement that Huser mainly wanted to introduce at trial.
I.The Excluded Out-of-Court Statements.
To begin, it is important to review the entire list of Woolheater out-of-court statements that were not admitted at the second trial.
1. Before Morningstar disappeared, Woolheater told Lawrence Webb that he (Woolheater) had been following Morn-ingstar, that.he was going to rough him up, and that he had already done so by breaking his ribs. When Webb asked Woolheater why he would hurt Mornings-tar, Woolheater explained, “Vern [Huser] wanted something done about it.”
2. On another occasion, shortly before Morningstar disappeared, Woolheater drove with Patti Mitrisin to Woolheater’s Quonset hut, exited the vehicle, and met with a person at the hut. Upon Woolheater’s return, he told Mitrisin he had been meeting with Huser, that “there was a guy messing around with Vem’s wife or ex-wife ... and he [Huser] wanted this guy roughed up.” He further stated that he was going to “get [his] uncles or [his] nephew or somebody to do that.”
3. Also before Morningstar disappeared, Woolheater told Maine Connett in a phone conversation that he had a friend whose wife was cheating on him. Woolheater told Connett he was going to kill the other man because “we stick together.”
4. The day after hunters came upon Morningstar’s remains, Woolheater told Webb that only Woolheater, Huser, and Webb knew about the body.
5. One evening when Woolheater and Zwank were going by Morningstar’s house a couple of days before Morningstar disappeared, Woolheater told Zwank Mornings-tar knew something about him that could *511 get him into trouble and he would end up back in jail. “It was kind of vague.”
6. A “couple of days later,” on the fateful night of September 30, 2004, Woolheater told Zwank that “Ricky and Mark [Wool-heater’s purported nephew and brother] were going to deal with Lance.” Thereafter Woolheater pretended to be in communication with Ricky and Mark. Woolheater had Zwank drop him off near Morningstar’s house so he could “check and see what was going on.” Later, Zwank picked up Wool-heater and said something like “Ricky made a hell of a shot,” before Woolheater and Zwank loaded what was apparently Morningstar’s body in the car.
At trial, Huser wanted to get items #5-#6 only admitted—principally item #5— while keeping items #l-#4 from being admitted. The district court ruled that items #5-#6 could be admitted, but this would “open the door” to the admission of items #l-#4.
As I read the record, Huser’s counsel did not challenge this open-the-door ruling at trial. Nor, as I read the briefing, did he challenge it on appeal. So I do not believe error was preserved on this evidentiary ruling.
Even if error was preserved, both the court of appeals and the district court gave independently valid reasons for sustaining the ruling.
II. Statement Against Interest.
For its part, the court of appeals bypassed the issue of opening the door by simply ruling that items #5 and #6 did not qualify as statements against interest. I think the court of appeals got it right.
At the time of trial, Iowa Rule of Evidence 5.804(b)(3) (2013) defined a statement against interest as follows:
A statement which was at the time of its making so far contrary to the declarant’s pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant’s position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.
Item #5 does not qualify as such a statement in my view. Woolheater’s “vague” assertion that Morningstar had something on Woolheater that could land Woolheater back in jail was not a statement that could expose Woolheater to criminal liability. Nor were there corroborating circumstances that clearly indicate its truthfulness.
Item #6 does not qualify, either. Let’s assume the statements that Ricky and Mark were going to deal with Morningstar and that Ricky had made a hell of a shot could be viewed as exposing Woolheater to criminal liability for conspiratorial involvement in the shooting of Morningstar. Nonetheless, the statements are clearly not trustworthy. No one contends that “Ricky and Mark” were actually involved in shooting Morningstar. This was a fabrication.
Notably, the majority treats #5 and #6 as if they were just one statement. But they aren’t. They were made a couple of days apart. In State v. Paredes, we indicated that the court should not treat an entire narrative as a single statement but should limit the relevant statement to “inculpato-ry statements and the collateral material necessary to provide context” to the relevant statement. 775 N.W.2d 554, 565 (Iowa 2009). Certainly, we did not say you could treat statements •with two days of distance *512 between them as one unit for rule 5,804(b)(3) purposes.
Even so, there are no corroborating circumstances of trustworthiness. In fact, if you treat #5 and #6 as a single statement, this simply highlights the unreliability of the whole thing. See id. at 567 (“[T]he best approach to' determining whether a statement is adequately corroborated appears to be a multifaetored test in which all evidence'bearing on the trustworthiness of the underlying statement may be considered.”).
The majority points to three out-of-state cases to support its reasoning, although it doesn’t really tell us much about them. I would like to go through all three cases, because none of them help the court.
In People v. Jackson, 235 Cal.App.3d 1670, 1 Cal.Rptr.2d 778 (1991), the defendant sought to introduce the following exchange that occurred thirty minutes after the shooting:
Defendant said to Tolbert, “Greg, ‘You shot that guy.’” To which Tolbert replied, “ ‘No, I don’t think I hit him.’ ” The defendant persevered, “ ‘No, I think you shot the guy. He was a big brother.’ ” Tolbert responded, “ ‘Well, I don’t care. He was a bully.’” Defendant of-, fered his own testimony and that of Lamont Butcher to this conversation.
Id. at 782. Jackson thus involved a single statement that (1) exposed the declarant to criminal liability, while also (2) giving a potential motive. The court held the statement should have been admitted. Id. at 782-83.
People v. Pierre, 129 A.D.3d 1490, 11 N.Y.S.3d 389 (2015), concerned the following: “Two witnesses testified at the hearing that a third party (declarant) admitted that he beat the two victims with a baseball bat in their apartment and set a fire to destroy- the evidence.” Id. at 390. Like Jackson, Pierre addressed specific statements that exposed the declarant to criminal liability while also including information about motive. The court held the statements should have been admitted. Id. at 391.
Finally, in State v. Morales, 788 N.W.2d 737 (Minn. 2010), the tables were turned somewhat. The question was whether the following statements introduced at trial by the state should have been admitted:
In the first two statements, Vega-Lara admitted that he and another person each carried a gun and went to the house of prostitution with the intent to commit a robbery. The fact that Vega-Lara claimed that another person went with him and also carried a gun does not -lessen Vega-Lara’s own culpability....
Vega-Lara’s third statement, as relayed by M.G. was- that “another person was struggling with the victim and Mr. Vega-Lara shot the victim.”
Id. at 766. The court found all three statements admissible, noting that they exposed the declarant to criminal liability even though they also inculpated a third party. Id. Although the court today characterizes the first two statements as “statements of motivation for criminal acts,” I would describe them simply as admissions to criminal acts.
In short, none of these three cases involve a stand-alone statement of motive like item #5. None of them hold that such a statement can be admitted as a statement against interest. If anything* the first two cases would support the admission of items #1, #2, and #3—but not item #5. Items #1, #2, and #3, not item #5, are the out-of-court declarations that both exposed the declarant to criminal liability and included information on motive.
Therefore, I agree with the court of appeals. One could simply affirm on the *513 ground that items #5 and #6 were properly excluded and leave the matter there.
However, to its credit, the trial court offered Huser a fair alternative to outright exclusion. The court said items #5-#6 could be admitted but then items #l-#4 could also be admitted. Huser declined the deal. Yet this ruling was sound and also should be affirmed.
III. Opening the Door.
In discussing “opening the door,” the majority posits this case as one where Huser sought to introduce otherwise admissible evidence and the district court decided this would open the door to otherwise inadmissible evidence. As I’ve already explained, I think the opposite is true. Items #1, #2, #3, and #4 could have been admitted as statements against interest, but items #5 and #6 could not.
Regardless, it would be illogical to allow the defendant to introduce the one Wool-heater statement that might have suggested Woolheater acted out of a personal motive while prohibiting the State from introducing the four Woolheater statements that suggested Woolheater was acting at the behest of the defendant.
Although this precise issue has not been heavily litigated, some caselaw supports my view. In State v. Ellison, 213 Ariz. 116, 140 P.3d 899 (2006) (en banc), the court held,
[I]f Ellison had introduced Finch’s statements to Howe while at Red’s Bar, he could not then claim a Confrontation Clause violation if the prosecution introduced Finch’s other statements made during their continued conversation on the way home from the bar. Judge Moon thus did not err in ruling that if Ellison offered part of Finch’s hearsay statements, the State could question Howe with the remainder of the conversation.
Id. at 913-14. Similarly, in State v. Buckhanon, No. M2011-00619-CCA-R3-CD, 2012 WL 6989858 (Tenn. Crim. App. 2012), the court reasoned that “allowing Mr. Smith to testify concerning what Warfield [the unavailable declarant] had told him would open the door to allowing the differing versions of the incident given by War-field.” Id. at *5. The court added further, “[T]he contradictory statements given by Warfield were evidence of a lack of the indicia of reliability required by [Tennessee caselaw].” Id.; see also Cal. Evid. Code § 1202 (West, Westlaw current with urgency legislation through Ch. 4 of 2017 Reg. Sess.) (“Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other ' conduct.”); id. cmts. (“Section 1202 substitutes for this case law a uniform rule permitting a hearsay declarant to be impeached by inconsistent statements in all cases, whether or not the declarant has been given an opportunity to explain or deny the inconsistency. If the hearsay declarant is unavailable as a witness, the party against whom the evidence is admitted should not be deprived of both his right to cross-examine and his right to impeach.”).
It is important to be clear about what is at issue here. The issue is not whether nonincülpatory statements of an unavailable declarant should come into evidence whenever inculpatory statements of the same declarant are admitted. I do not argue for such a sweeping principle. Rather, my point is that when an unavailable declarant has given different and inconsistent versions of a story, it would be unfair for the defendant to be able to cherry-pick only one version for the jury’s benefit.
*514 Indeed, Huser’s trial counsel accepted the essential justness of the district court’s open-the-door ruling and, in my view, did not preserve error on it.[3]
For all these reasons, I would affirm Huser’s conviction and sentence.
Waterman and Zager, JJ., join this concurrence in part and dissent in part.

. At the conclusion of the offer of proof, the district court stated,
[T]he trouble I'm having, Mr. Parrish, is then if the defense is allowed to bring in the [statement] of Woolheater saying that he had a motivation, then why would not the [statements] that Woolheater said regarding—associating Vern [Huser] to it, not to be personal—
MR. PARRISH: I understand.
THE COURT: —but Mr. Huser to it, why would that [not] be admissible also?
MR. PARRISH: Well, exactly, Judge, and that's one of the discussions we had—and we've talked about it the last two or three evenings—is that what it does open the door, that’s why I wanted to bring it to the Court's attention.